# TRANS ALASKA PIPELINE RATE CASES*

Argued March 28, 1978—Decided June 6, 1978

---

*No. 77–452, *Mobil Alaska Pipeline Co.* v. *United States et al.;* No. 77–457, *Exxon Pipeline Co.* v. *United States et al.;* No. 77–551, *BP Pipelines, Inc.* v. *United States et al.;* and No. 77–602, *ARCO Pipe Line Co.* v. *United States et al.*

BRENNAN, J., delivered the opinion of the Court, in which all other Members joined, except POWELL, J., who took no part in the consideration or decision of the cases.

*Andrew J. Kilcarr* and *Richard J. Flynn* argued the cause for petitioners in all cases and for Union Alaska Pipeline Co. et al. (respondents under this Court's Rule 21 (4)). With them on the joint briefs were *William J. T. Brown, James R. Kinzer, William R. Connole, David M. Schwartz, Lee A. Monroe, Robert E. Jordan III, James H. Pipkin, Jr., Steven H. Brose,* and *Jack Landsdale, Jr.*

*Deputy Solicitor General Easterbrook* argued the cause for the federal respondents in all cases. With him on the brief were *Solicitor General McCree, Assistant Attorney General*

*Shenefield, Allan A. Ryan, Jr., Donald A. Kaplan, Mark L. Evans, Christine N. Kohl,* and *Philip R. Telleen. Avrum M. Gross,* Attorney General of Alaska, argued the cause for respondents State of Alaska et al. in all cases. With him on the brief were *Philip Elman, Robert M. Lichtman, Terry F. Lenzer,* and *Robert E. Nagle.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The primary question presented in these cases is whether the Interstate Commerce Commission is authorized by § 15 (7) of the Interstate Commerce Act, as added, 36 Stat. 552, and amended, 49 U. S. C. § 15 (7),[1] to suspend *initial* tariff schedules of an interstate carrier subject to Part I of the Act, 24 Stat. 379, as amended, 49 U. S. C. §§ 1–27 (1970 ed. and Supp. V). In addition, we are asked to decide whether, if the Commission is so authorized, it has additional authority summarily to fix maximum interim tariff rates which will be allowed to go into effect during the suspension period and to require carriers filing tariffs containing such rates, as a further condition of nonsuspension, to refund any amounts collected which are ultimately found to be unlawful. We hold that the Commission has statutory authority to suspend initial tariff schedules and that it has power ancillary to that authority to establish maximum interim rates and associated regulations—including refund provisions—as it has done in these cases.

---

[1] "Whenever there shall be filed with the Commission any schedule stating a new individual or joint rate, fare, or charge, . . . the Commission shall have . . . authority . . . to enter upon a hearing concerning the lawfulness of such rate, fare, [or] charge . . . ; and pending such hearing and the decision thereon the Commission, upon filing with such schedule and delivering to the carrier or carriers affected thereby a statement in writing of its reasons for such suspension, may from time to time suspend the operation of such schedule and defer the use of such rate, fare, [or] charge . . . , but not for a longer period than seven months beyond the time when it would otherwise go into effect . . . ."

I

In 1968, massive reservoirs of oil were discovered at Prudhoe Bay in the Alaskan Arctic. Two years later plans crystallized to build a pipeline from Prudhoe Bay to the all-weather port of Valdez on Alaska's Pacific coast. After protracted environmental litigation was ended by special Act of Congress,[2] construction of the Trans Alaska Pipeline System (TAPS) began in 1974. In May and June 1977, seven of the eight owners of TAPS,[3] anticipating completion of TAPS in mid-1977, filed tariffs with the Interstate Commerce Commission[4] setting out the rules and rates governing transportation

---

[2] Trans-Alaska Pipeline Authorization Act, 87 Stat. 584, 43 U. S. C. § 1651 et seq. (1970 ed., Supp. V).

[3] Each of eight companies holds an undivided interest in TAPS and each has the "right and obligation to utilize its share of TAPS capacity as an independent common carrier." Joint Brief for Petitioners 5. The interests held by each owner are as follows:

| | |
|---|---|
| Sohio Pipe Line Co. | 33.34% |
| ARCO Pipe Line Co. | 21.00 |
| Exxon Pipeline Co. | 20.00 |
| BP Pipelines, Inc. | 15.84 |
| Mobil Alaska Pipeline Co. | 5.00 |
| Phillips Alaska Pipeline Corp. | 1.66 |
| Union Alaska Pipeline Co. | 1.66 |
| Amerada Hess Pipeline Corp. | 1.50 |

Trans Alaska Pipeline System, 355 I. C. C. 80, 91–93 (1977) (TAPS). Phillips Alaska Pipeline Corp. filed its tariffs later than the other seven carriers and has filed a petition for review of the suspension of its tariffs in the Court of Appeals for the District of Columbia Circuit, where decision has been deferred pending decision by this Court in these cases. See Joint Brief for Petitioners 4 n. 2.

[4] Oil pipelines were until October 1, 1977, subject to the jurisdiction of the Interstate Commerce Commission. See 49 U. S. C. § 1 (1) (b). On that date, jurisdiction over the transportation of oil in interstate commerce by pipeline was transferred from the Interstate Commerce Commission to the Federal Energy Regulatory Commission (FERC). Department of Energy Organization Act of 1977, 91 Stat. 565, 42 U. S. C. § 7101 et seq. (1976 ed., Supp. I); Exec. Order No. 12009, 42 Fed. Reg. 46267

of oil over TAPS. These rates were met immediately by formal protests[5] from the State of Alaska,[6] the Arctic Slope Regional Corporation,[7] the United States Department of Justice,[8] and the Commission's Bureau of Investigations and Enforcement.[9]

Acting pursuant to § 15 (7) of the Interstate Commerce Act, the Commission[10] found that the protests lodged against the

(1977). Further proceedings on the TAPS tariffs are pending before FERC.

[5] See 49 CFR § 1100.42 (1976).

[6] The State of Alaska owns a one-eighth royalty interest in Prudhoe Bay oil, which is calculated to be equal to 12.5% of the "wellhead value" of that oil. The parties tell us (although recent reports of falling oil prices on the west coast tend to cast doubt on this) that the market price of oil is essentially fixed. Accordingly, wellhead value is approximately determined by subtracting transportation costs from the fixed market price. See 1 App. 554a. For this reason, the State claims to lose 23 cents in royalties for every dollar by which the TAPS rate exceeds a just and reasonable level. Brief for Respondent State of Alaska 7.

[7] The Corporation, one of 13 established pursuant to the Alaska Native Claims Settlement Act, 85 Stat. 688, 43 U. S. C. §§ 1601–1627 (1970 ed., Supp. V), represents the interests of the Inupiat Eskimos, who have a claim to be paid 2% of the wellhead value, see n. 6, *supra*, of Alaskan crude oil up to a total of $500 million as consideration for their surrender of aboriginal land claims in the Prudhoe Bay area. The rate at which the Corporation collects revenue is inversely proportional to the TAPS rate. See *ibid.* Accordingly, if the TAPS rate is too high, the Corporation, which has a great immediate need for oil royalties, is harmed.

[8] The Department of Justice argued that the proposed TAPS rates were unreasonably high and would accordingly "discourage exploration and development of new fields by reducing the wellhead value of crude [oil]." 1 App. 95a. Such discouragement was said to be "inconsistent with national energy policy." *Ibid.*

[9] The Bureau argued that the proposed rates were "prima facie unreasonable," *id.*, at 143a, and should be suspended pending a full investigation.

[10] Rather than referring the TAPS protest to its staff suspension board and its appellate division of three Commissioners, as is routinely done in suspension cases, see 49 CFR § 1100.200 (1976), the Commission itself heard oral argument on the protests and determined that the TAPS rates should be suspended.

TAPS tariffs gave it "reason to believe the proposed rates are not just and reasonable." *Trans Alaska Pipeline System,* 355 I. C. C. 80, 81 (1977) (*TAPS*). In support of this conclusion, it cited the protestants' arguments that the filed rates allowed excessive returns on capital [11] and that the cost data provided by the carriers were overstated.[12] Dismissing the TAPS carriers' argument that § 15 (7) gave the Commission no power to suspend initial rates, the Commission suspended the TAPS rates for the full seven months allowed by law, see 355 I. C. C., at 81–82, citing protestants' showing of "probable unlawfulness," *id.,* at 81, and the Commission's concern that "maintenance of excessively high rates could act as a deterrent or an obstacle to the use of the pipeline by nonaffiliated oil producers, and would also delay the Alaskan interests in obtaining revenues that depend upon the well-head price of the oil." *Id.,* at 82.

On the other hand, the Commission found that it would not be in the public interest if TAPS had to close for a seven-month period. *Id.,* at 83. Accordingly, "accept[ing] the basic data supplied by the carriers" as true, *ibid.,* the Commis-

---

[11] According to carrier data, the aggregate debt-equity ratio in TAPS financing was approximately 85%–15%. 1 App. 23a–24a, 159a; *TAPS, supra,* at 91. In calculating their rates, the carriers deducted interest expense in the computation of net income and then added a return element to calculated net income sufficient to provide them a 7% return on *total* investment, *i. e.,* both debt and equity. 3 App. 177–178. The protestants characterized this as "double-dipping." Brief for Respondent State of Alaska 13. The carriers defended the practice as being consistent with Commission practice and a consent decree entered in *United States* v. *Atlantic Refining Co.,* C. A. No. 14060 (DC, Dec. 23, 1941). See, *e. g.,* 1 App. 349a–355a; 3 App. 178.

[12] TAPS was originally estimated to cost less than $1 billion. 1 App. 10a. However, the estimated cost on which tariffs were calculated by the TAPS carriers was over $9 billion. *Id.,* at 102a, 117a. Protestants argued that much of the $9 billion represented waste and mismanagement on the part of the TAPS owners and could not, therefore, be included in the TAPS rate base. *E. g., id.,* at 10a–11a.

sion applied what it stated to be its traditional rate-of-return calculation [13] to compute new rates that approximated what full investigation would likely reveal to be lawful rates [14] and it stated that it would not suspend interim tariffs which specified rates no higher than those estimated. See *id.*, at 83–86. However, since the estimated rates might still "exceed reasonable levels," the Commission stated that any interim tariffs must provide for refunds of any amounts later determined to be in excess of lawful rates. *Id.*, at 86.[15]

Four pipeline owners, petitioners here,[16] filed a petition for review of the Commission's suspension order in the Court of Appeals for the Fifth Circuit. That court determined: (1) that the Commission had the statutory authority to suspend

---

[13] Usually, the Commission uses an 8% return on valuation in setting pipeline rates, but in recognition of the extreme risk of the TAPS venture, the Commission used 10% in setting the interim rates. See *TAPS*, 355 I. C. C., at 85.

[14] The rates initially filed and the maximum interim rates allowed by the ICC are as follows:

| Carrier | Proposed Rate | Interim Rate | Reduction |
|---|---|---|---|
| Amerada Hess | $6.44 | $4.85 | $1.59 |
| BP | 6.35 | 4.68 | 1.67 |
| Mobil Alaska | 6.31 | 4.84 | 1.47 |
| Exxon | 6.27 | 5.10 | 1.17 |
| Phillips Alaska | 6.22 | 4.83 | 1.39 |
| Sohio | 6.16 | 4.70 | 1.46 |
| Union Alaska | 6.09 | 4.89 | 1.20 |
| ARCO | 6.04 | 4.91 | 1.13 |

See *id.*, at 80, 87, 94.

[15] In addition, the Commission authorized the carriers to file new tariffs which could become effective on as little as one-day's notice, and it instituted a formal adjudicatory investigation into the lawfulness of the suspended rates pursuant to 49 U. S. C. § 15 (1). *TAPS, supra*, at 87–88.

[16] Sohio Pipeline Co., Union Alaska Pipeline Co., and Amerada Hess Pipeline Corp. were intervenors in the proceedings below and are parties here. See this Court's Rule 21 (4).

an initial tariff as well as changes in tariffs; (2) that it had authority ancillary to the suspension power to set out, without an adjudicatory hearing, maximum interim rates which it would allow to go into effect during the suspension period; and (3) that it had authority to condition a decision not to suspend tariffs on a requirement that carriers whose tariffs were allowed to go into effect be prepared to make refunds of any amounts collected—whether under initially proposed or interim tariffs—which were later determined (after full hearing) to be unlawful. *Mobil Alaska Pipeline Co.* v. *United States,* 557 F. 2d 775 (1977).

Petitioners sought review in this Court and filed applications for a stay of the Commission's suspension order, all relief having been denied by the Fifth Circuit. On October 20, 1977, we granted the applications for a stay, 434 U. S. 913, and we issued a supplemental stay order on November 14, 1977. 434 U. S. 949. Thereafter we granted certiorari to consider the three issues decided by the Court of Appeals. 434 U. S. 964. We affirm.[17]

---

[17] In the Court of Appeals, the United States argued that *Arrow Transportation Co.* v. *Southern R. Co.,* 372 U. S. 658 (1963), and *United States* v. *SCRAP,* 412 U. S. 669 (1973), divest courts of jurisdiction to review suspension orders of the Interstate Commerce Commission. In this Court, the United States has modified that position and now apparently concedes that courts have jurisdiction to review suspension orders to the limited extent necessary to ensure that such orders do not overstep the bounds of Commission authority. We agree.

*Arrow* and *SCRAP* stand for two propositions: first, that federal courts have no power to enjoin rate changes before the Commission has finally determined the lawfulness of rates, see *Arrow, supra,* at 669; *SCRAP, supra,* at 691; and, second, that federal courts have no power to make "an independent appraisal of the reasonableness of rates," *Arrow, supra,* at 670–671; see *SCRAP, supra,* at 692. Although reversal of a suspension order on judicial review might have the effect of allowing a rate to go into effect, such a reversal would not have the effect of an injunction, which jeopardizes "the regulatory goal of uniformity" of rates, *Arrow, supra,* at 664; see *infra,* at 641, since the effect of the reviewing court's judgment

## II

By the Act of Sept. 18, 1940, ch. 722, Tit. I, § 1, 54 Stat. 899, note preceding 49 U. S. C. § 1, Congress declared the National Transportation Policy of the United States to be "to encourage the establishment and maintenance of reasonable charges for transportation services." Part I of the Interstate Commerce Act, 24 Stat. 379, as amended, 49 U. S. C. §§ 1–27 (1970 ed. and Supp. V), which applies to common carriers by rail and pipeline, is one vehicle by which the National Transportation Policy is carried into effect. Under the Act as passed in 1887, however, the role of the Commission in establishing "reasonable charges" was circumscribed. Although § 1 of the Act provided that "[a]ll charges made for any service rendered or to be rendered in the transportation of passengers or property . . . shall be reasonable and just; and every unjust and unreasonable charge for such service is prohibited and declared to be unlawful," 24 Stat. 379, this Court early held that the Commission had no authority to set charges, but could only determine if charges set by the carriers were unreasonable or unjust in the context of granting reparations to injured shippers. See *ICC* v. *Cincinnati, N. O. & T. P. R. Co.*, 167 U. S. 479 (1897); 1 I. Sharfman, The Interstate Commerce Commission 25–27 (1931) (hereinafter Sharfman).

---

would be to void the suspension order as to all affected carriers in all regions of the country. Moreover, under the recently modified provisions for judicial review of ICC orders, only one reviewing court could have jurisdiction over a suspension order. See 28 U. S. C. §§ 2341 (3) (A), 2342 (5) (1970 ed., Supp. V), added by Pub. L. No. 93–584, §§ 3–4, 88 Stat. 1917; 28 U. S. C. § 2349 (a). And, although we reaffirm our previous holding that courts may not independently appraise the reasonableness of rates, no such appraisal is involved in inquiring whether the Commission has overstepped the bounds of its authority. Therefore, we conclude that Congress did not mean to cut off judicial review for such limited purposes. Cf. *Dunlop* v. *Bachowski*, 421 U. S. 560, 567 (1975); *Abbott Laboratories* v. *Gardner*, 387 U. S. 136, 140–141 (1967); *Leedom* v. *Kyne*, 358 U. S. 184, 190 (1958).

In 1906, Congress passed the Hepburn Act, 34 Stat. 584, which, *inter alia,* augmented the Commission's authority to condemn existing rates as unjust or unreasonable by adding express authority to set maximum rates to be observed by carriers in the future. See 49 U. S. C. § 15. Under the Hepburn Act, however, the Commission could not issue an order affecting a rate until it had become effective. This feature of the Hepburn Act was immediately recognized by the Commission as a major defect. See Sharfman 51 n. 50. It meant that the only relief against unreasonable rates lay in the reparations remedy and this could not provide a satisfactory solution:

> "In many cases the damage suffered through loss of competitive advantage far exceeds the difference between the rate actually charged and that found to be reasonable by the Commission; and in most instances the burden of the unreasonable rate is borne by a prior producer or is shifted to the ultimate consumer, for whom no redress whatever is available as against the carrier." *Id.,* at 51.

See H. R. Rep. No. 923, 61st Cong., 2d Sess., 4 (1910), quoting President Taft's special message to Congress on the Interstate Commerce Act;[18] S. Rep. No. 355, 61st Cong., 2d Sess., 8 (1910);[19] *United States* v. *Chesapeake & Ohio R. Co.,* 426 U. S. 500, 513, and n. 10 (1976) (*Chessie*); Dixon, The Mann-Elkins Act, 24 Q. J. Econ. 593, 602–603 (1910)

---

[18] " 'It may be doubted how effective [the reparations] remedy really is. Experience has shown that many, perhaps most, shippers do not resort to proceedings to recover the excessive rates which they may have been required to pay, for the simple reason that they have added the rates paid to the cost of the goods and thus enhanced the price thereof to their customers, and that the public has in effect paid the bill.' "

[19] "[I]n practice it is found that . . . restitution is but seldom sought or awarded; probably because the shipper generally recoups himself from the public for the amount of the loss through the augmented price of the commodity."

(hereinafter Dixon). The Commission's Annual Reports also tell us that, as early as 1907, private litigants were able to convince some federal courts to enjoin rate advances after their effective dates but before the Commission was able to complete an investigation as required by the Hepburn Act. See *Arrow Transportation Co. v. Southern R. Co.,* 372 U. S. 658, 663–664, and n. 6 (1963); Sharfman 50 n. 49. Thus, not only did the Hepburn Act fail to protect the public against unreasonable carrier charges, but the equity litigation spawned by the Act led to discrimination in rates—much like that prohibited by § 1 of the Act—in the situation in which shippers successful in court would be paying one charge while those who were unsuccessful, or who did not have the wherewithal to go to court or to post an injunction bond, were paying higher charges. See *Arrow, supra,* at 663–664; Sharfman 50 n. 49; Dixon 603.

To "provid[e] a 'means . . . for checking at the threshold new adjustments that might subsequently prove to be unreasonable or discriminatory, safeguarding the community against irreparable losses and recognizing more fully that the Commission's essential task is to establish and maintain reasonable charges and proper rate relationships,'" *Chessie, supra,* at 513, quoting Sharfman 59, Congress passed the Mann-Elkins Act of 1910, 36 Stat. 539. Section 12 of that Act, 36 Stat. 552, amended § 15 of the Interstate Commerce Act to allow the Commission to suspend "any schedule stating a new individual or joint rate, fare, or charge" for a period not to exceed 10 months. The suspension power conferred was intended to be a "particularly potent tool," giving the Commission "'tremendous power.'" *Chessie, supra,* at 513, quoting 45 Cong. Rec. 3471 (1910) (statement of Sen. Elkins speaking on behalf of majority report).

Section 15 of the Act, as augmented by the Hepburn and Mann-Elkins Acts, thus works with §§ 1 and 6 of the Act, 49 U. S. C. §§ 1 and 6 (1970 ed. and Supp. V), to give the Com-

mission a complete ratemaking charter. Section 1, as we have indicated above, sets the standard that rates and charges must meet, and § 6—which prohibits a carrier covered by Part I from engaging in interstate transportation unless its rates, fares, and charges have been filed and published and which, in addition, allows changes in any rate, fare, or charge to be made only after notice to the Commission and public through advance filing of schedules showing the proposed changes, see 49 U. S. C. §§ 6 (1), 6 (3), and 6 (7)—insures both that the Commission will have sufficient notice to exercise its suspension power and that no carrier can operate on suspended or disapproved schedules.

## III

With this background in mind, we turn to the question whether the Commission is authorized by § 15 (7) to suspend the initial rates of a common carrier subject to Part I of the Interstate Commerce Act.

Section 15 (7) states that "[w]henever there shall be filed . . . *any* schedule stating a *new* individual or joint rate, fare, or charge, . . . the Commission . . . may from time to time suspend the operation of such schedule . . . ." (Emphasis added.) It is hard to imagine rates any more "new" than those filed for TAPS, a service which has never before been offered. And, since § 15 (7) applies to *any* new rate, there is little room to argue that Congress meant the suspension power not to apply to these cases, although we recognize that the Court of Appeals found that § 15 (7) had no plain meaning. See 557 F. 2d, at 781.

Nonetheless, petitioners argue that "new" does not really mean "new," but refers only to increased or changed rates, *i. e.,* rates which replace other rates previously in effect. As we understand the argument, it draws on three sources. First, it is said that Congress in 1910 was directing its attention solely to the problem of increased railroad rates and, therefore, that the statute should be limited to this application. Second,

petitioners argue that the only rate schedules the Interstate Commerce Act requires to be filed prior to their effective date are schedules of *changed* rates. See 49 U. S. C. § 6 (3). Since in their view § 15 (7) is intended to work in tandem with § 6 (3), petitioners conclude that new schedules include only changed schedules. Finally, petitioners point to language added to § 15 (7) by § 418 of the Transportation Act of 1920, 41 Stat. 484–487, which they say authoritatively glosses the word "new," limiting it to the increased rate situation. We find these arguments unpersuasive.

## A

This Court, in interpreting the words of a statute, has "some 'scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results . . . or would thwart the obvious purpose of the statute' . . . [b]ut it is otherwise 'where no such consequences would follow and where . . . it appears to be consonant with the purposes of the Act . . . .' " *Commissioner* v. *Brown,* 380 U. S. 563, 571 (1965) (citations omitted). Under this test, a restriction on the "literal or usual meaning" of the word "new" is not warranted by the legislative history of the Mann-Elkins Act.

First, petitioners' claim that the Commission is without authority to suspend initial rates is not limited to situations in which proposed initial rates are in some sense reasonable; it is a claim that a carrier can impose any rate it chooses.[20] Nor have petitioners pointed to any mechanism which would tend to make initial rates reasonable, and Congress in 1910 concluded that the reparations provisions of the Commerce

---

[20] See 3 App. 17–18:

"[ICC] Commissioner Hardin: If we do not have the power to suspend then would the carriers be in a position to file a rate, say, at $35 a barrel, and the Commission still could not suspend that?

"[Exxon counsel]: If you do not have that power, that would be right."

644

Act are an insufficient check. Moreover, in these cases, the reparations remedy is particularly ineffective since those who will ship oil over TAPS are almost exclusively parents or co-subsidiaries of TAPS owners.[21] Thus, to an indeterminate, but possibly large extent, excess transportation charges to shippers will be offset by excess profits to TAPS owners, creating a wash transaction from the standpoint of parent oil companies. Indeed, it is telling that no shipper of oil protested the TAPS rates. Instead, as one might predict from experience under the Hepburn Act, see *supra,* at 640–641, only the public perceives that it will be injured by the proposed TAPS rates and has objected to them. See nn. 6–8, *supra.* Therefore, in the absence of suspension authority, unreasonable initial rates—both generally and in these cases—like unreasonable increases in existing rates, will almost certainly be passed along to "a prior producer or . . . to the ultimate consumer." Sharfman 51.

Second, if the Commission has no authority to suspend initial rates, it follows that Congress cannot have meant to foreclose whatever equity power there is in the courts to enjoin

---

[21] The United States, pointing to an agreement between Sohio and BP that Sohio will tender to BP oil to the extent of the latter's TAPS ownership, computes the relationship between equity interests and TAPS interests as follows:

| Carrier | TAPS Interest | Oil Interest |
|---|---|---|
| Sohio/BP | 49.18% | 53.155% |
| ARCO | 21.00 | 20.274 |
| Exxon | 20.00 | 20.274 |
| Mobil | 5.00 | 2.094 |
| Phillips | 1.66 | 2.044 |
| Amerada Hess | 1.50 | .538 |
| Union Oil | 1.66 | 0.000 |
| Ten Others | 0.00 | 1.619 |

Brief for Federal Respondents 7–8, n. 4. The oil equity interests computed by petitioners are different, but not substantially so. See Joint Brief for Petitioners 6 n. 6.

carrier rates. Thus, with respect to initial rates, courts might again reach "diverse conclusions," jeopardizing "the regulatory goal of uniformity," and "causing in turn 'discrimination and hardship to the general public.'" *Arrow,* 372 U. S., at 664, quoting ICC Annual Report 10 (1907).[22]

Accordingly, far from reaching an "'absurd resul[t]'" which would "'thwart the obvious purpose of the statute,'" *Brown, supra,* at 571, a literal reading of the word "new" in § 15 (7) is necessary to curb mischief flowing from unchecked initial rates, which is in every way identical to that flowing from unchecked changes in rates to which the Mann-Elkins Act is concededly addressed. Given the equivalence of the harms resulting from unchecked initial and changed rates, only unequivocal statements in the legislative history of the Act would support any limitation on the scope of the suspension power. Petitioners, however, have been able to offer only isolated remarks made in floor debates in favor of their position.[23] These show at most that the primary area

---

[22] In the past, actions for injunctions were brought in diversity of citizenship cases under the common law of carriers or under federal-question jurisdiction on the theory that the Sherman Act was being violated by a rate increase or alternatively that there was an implied right of action under § 1 of the Interstate Commerce Act, 49 U. S C. § 1. See, *e. g., Northern Pac. R. Co.* v. *Pacific Coast Lumber Mfrs.,* 165 F. 1 (CA9 1908); *Jewett Bros. & Jewett* v. *Chicago, M. & St. P. R. Co.,* 156 F. 160 (CC S. D. 1907). The provisions consolidating judicial review of ICC orders in a single court of appeals, see n. 17, *supra,* are therefore not apposite to actions for injunctive relief and it would still be possible for district courts to reach conflicting views about the propriety of injunctive relief, a conflict that would create the rate discriminations sought to be ended by the Mann-Elkins Act.

[23] Petitioners place particular emphasis on the following statement of Representative Mann:

"[W]hen the railroad company then files this schedule of rates proposing to increase the rates, we say it is a reasonable presumption that the rate which has existed, possibly for a long time—but whether for long or short, the one in existence—is a fair rate, and should remain in force until the

of congressional concern was the situation in which railroads increased their pre-existing rates. There is nothing to show that Congress intended to limit the suspension power to this situation, however, and, indeed, other isolated remarks show quite clearly that Representative Mann, at least, thought both initial and changed rates could be suspended.[24] Therefore, we conclude that the word "new" must be given its literal interpretation, which embraces the rates that are the subject of this litigation.[25]

---

commission has had an opportunity to give some investigation to the subject. That seems to be fair to the railroad company and fair to the shipper." 45 Cong. Rec. 4713 (1910).

Just before this, however, Mann stated:

"We have therefore provided in the bill that where the schedule of rates is filed with the commission proposing to *change* an existing rate, the commission shall have authority to suspend the taking effect of that rate; *and* we provide that when there shall be filed with the commission a schedule stating a *new* rate or classification or regulation or practice, the commission . . . may suspend the operation of the proposed rate, classification, regulation, or practice . . . ." *Id.*, at 4711 (emphasis added).

Thus, Mann quite clearly recognized that the suspension power extended to both changes in rates and schedules stating initial rates. Moreover, Mann, in defending the suspension power, felt the need to discuss the situation in which a carrier puts in a rate "upon a new article." *Id.*, at 4711–4712. If the suspension power was meant to apply only where there was an old rate in effect, this element of Mann's defense would have been superfluous.

Petitioners also rely on statements made in the Senate which appear to refer solely to the rate increase situation. See Joint Brief for Petitioners 22 n. 29. These remarks, however, refer to an amendment to the Mann-Elkins Act, ultimately defeated, 45 Cong. Rec. 6915 (1910), introduced by Senator Cummins which prevented any change in rate "which is an increase over the then existing rate," *id.*, at 6409, from becoming effective until the Commission approved it. Therefore, the remarks are not relevant to an interpretation of the Act as passed.

[24] See n. 23, *supra*.

[25] Petitioners also argue that, were the Commission given authority to suspend initial rates, carriers would be prohibited for an extended period

## B

Nor do we think much can be made of the fact that Congress, in Part I of the Interstate Commerce Act, sometimes refers to "new" rates and sometimes to "changed" rates.

While it is true that § 6 (3) of the Act provides that "[n]o *change* shall be made in . . . rates . . . *which have been filed and published* by any common carrier . . . except after thirty days' notice to the Commission and to the public" (emphasis added), we do not not read this section to restrict § 15 (7), as petitioners do. Central to petitioners' argument is the premise that § 6 (3) provides the exclusive procedure through which tariffs can be filed with the Commission. But this is not so.

We can agree that § 6 (3) simply cannot describe the procedure to be followed for filing initial rates since that section, by its terms, applies only to changes in tariffs which have previously been filed with the Commission and initial tariffs by definition have not been so filed. However, the conclusion that § 6 (3) cannot govern the filing of initial tariffs only begins the analysis, for § 6 (1) of the Act—which states that "[e]very common carrier . . . shall file with the Commission . . . schedules showing *all* the rates, fares, and charges for transportation [over its routes,]" 49 U. S. C. § 6 (1) (emphasis added)—plainly requires initial rates as well as rates resulting from tariff changes to be filed with the Commission. Since initial tariffs cannot be filed under § 6 (3), the question therefore arises how initial tariffs are to be filed.

---

of time from using their facilities. This, they further argue, would constitute a confiscation prohibited by the Due Process Clause. As we indicate, see n. 33, *infra*, petitioners' major premise is misguided because suspension of initial rates does not pretermit filing of a lower rate to go into effect in the suspension period. Therefore, although a carrier may not be allowed to operate under its preferred rate, it is by no means obvious that it will have to refrain from operations or operate under a confiscatory tariff during the suspension period.

The Interstate Commerce Act gives no answer to this question; § 6 is silent on the issue. However, the Commission provided an answer by regulation in 1906 in order to clarify carrier obligations under the then recently enacted Hepburn Act.[26] In that year, the Commission issued Tariff Circular No. 2–A, which provided:

> "NEW ROADS.—On new lines of road, including branches and extensions of existing roads, individual rates may be established in the first instance, and also joint rates to and from points on such new line, without notice, on posting a tariff of such rates and filing the same with the Commission."

The immediately preceding paragraph of the same Circular provided that "Changes in Rates" had to be filed on 30 days' notice, which suggests that the Commission was aware that the 30-day requirement of § 6 (3), and indeed that § 6 (3) itself, was inapplicable to initial rates for "new roads." The rule announced in Circular 2–A became Rule 44 of Tariff Circular 14–A in 1907 and Rule 57 of Tariff Circular 15–A in 1908, a numerical designation which has been retained to this day. See 49 CFR § 1300.57 (1977).[27]

---

[26] Since the 1906 regulation is a "contemporaneous construction of [the Act] by the men charged with the responsibility of setting its [tariff] machinery in motion," *Norwegian Nitrogen Co.* v. *United States,* 288 U. S. 294, 315 (1933), its interpretation of how § 6 (1) should be implemented is presumptively correct. See, *e. g., ibid.; Udall* v. *Tallman,* 380 U. S. 1, 16 (1965).

[27] Tariff Circulars covering oil pipelines were apparently not promulgated until 1928. In that year Tariff Circular No. 20, which superseded all earlier Circulars, was promulgated and its version of Rule 57 provided that "[r]ates from, to, via, or at points reached via newly laid pipe lines . . . may be established or changed in like manner and upon like notice to that provided for newly constructed lines of railroad . . . ." Tariff Circular No. 20, Rule 57 (e). This provision is now codified as 49 CFR § 1300.57 (e) (1977) and is the provision under which TAPS rates were filed with the Commission. See Joint Brief for Petitioners 6.

Thus, in 1910 when the Mann-Elkins Act was passed, Commission practice was quite clear. Initial tariffs were filed under Rule 57 on 1 day's notice (later changed to 10 days' notice) and tariff changes were filed under the provisions of § 6 (3). Since both the Rule and the Act provided that tariffs should be filed with delayed effective dates, it was clearly possible for the Commission to suspend either initial or changed rates. Consequently, we find no basis for concluding either that § 6 (3) in fact provides the exclusive procedural avenue for filing tariffs or that Congress in 1910 would have thought that it did.

Similarly, although § 418 of the Transportation Act of 1920, 41 Stat. 484-487, added a sentence to § 15 (7)—"if the proceeding has not been concluded [within the suspension period], the proposed change . . . shall go into effect at the end of such period"—nothing in the legislative history of that Act suggests that "change" is to be read to restrict the scope of the suspension power. Moreover, the amending language of § 418 itself refers to both changed rates and rate increases, which would suggest that changed rates include more than rate increases.[28]

Finally, as we have indicated, the tariff provisions in Part I of the Act did not spring full grown into the statute books. Section 6 (3), part of the 1887 Act, was drafted at a time when the Commission had no ratemaking authority. Section 15 (7) traces to three Acts—the 1887 Act, the Hepburn Act, and the Mann-Elkins Act—and was then further amended by the Transportation Act of 1920. Since, therefore, the tariff provisions grew more like Topsy than Athena, it is inappropriate to insist that each phrase in those provisions fit meticulously

---

[28] "[I]f the proceeding has not been concluded . . . , the proposed *change* . . . shall go into effect . . . , but, in case of a proposed *increased* rate or charge [the Commission may impose recordkeeping and refund requirements on the carrier]." 41 Stat. 487 (emphasis added).

with every other. Instead, the Act must be construed not only by its language but by its purposes if sense is to be made of the verbal accretions of many years. Under this proper standard of construction, there is little to commend the argument that the word "change" was meant to narrow "new." To the contrary, the opposite construction—that "new" was intended to clarify the meaning of "change"—is more justified given the purposes of the Hepburn and Mann-Elkins Acts. Indeed, when Congress did enact comprehensive tariff schemes in Parts II,[29] III,[30] and IV [31] of the Interstate Commerce Act, which cover (respectively) motor carriers, common carriers by water, and freight forwarders, it indicated unequivocally in the language of the suspension provisions that initial rates were "new" rates capable of being suspended and yet references to "changed" rates appear in those Parts in each place they appear in Part I.[32]

---

[29] 49 U. S. C. §§ 301–327 (1970 ed. and Supp. V).

[30] §§ 901–923 (1970 ed. and Supp. V).

[31] §§ 1001–1022.

[32] The relevant provisions of § 15 (7) are reproduced *in haec verba* in 49 U. S. C. §§ 316 (g) ("Whenever there shall be filed with the Commission any schedule stating a new . . . rate, fare, [or] charge . . . , the Commission . . . may . . . suspend the operation of such schedule . . ."); 907 (g) ("Whenever there shall be filed with the Commission any schedule . . . stating a new rate, fare, [or] charge . . . , the Commission . . . may . . . suspend the operation of such schedule . . ."); and 1006 (e) ("Whenever there shall be filed with the Commission . . . any tariff stating a new rate, charge, classification, regulation, or practice, the Commission . . . may . . . suspend the operation of such tariff . . ."). As enacted, § 316 (g) provided that the suspension power "shall not apply to any *initial* schedule or schedules filed by any . . . carrier in bona fide operation when this section takes effect." Motor Carrier Act of 1935, § 216 (g), 49 Stat. 559, 560 (emphasis added). This provision was subsequently amended to state: "[T]his paragraph shall not apply to any *initial* schedule or schedules filed on or before July 31, 1938, by any . . . carrier in bona fide operation [on October 1, 1935]." Act of June 29, 1938, ch. 811, § 16, 52 Stat. 1240 (emphasis added). Substantially identical provisos—each

## C

For the reasons stated above, we conclude that the Commission is authorized by § 15 (7) to suspend rates which are "new" in the sense that they apply to services which have never before been offered to the public.

## IV

Our conclusion that the Commission can suspend TAPS's initial rates does not end our inquiry, for petitioners also argue that the Commission has here exceeded whatever power

exempting *initial* rates from suspension until a date certain—can be found in §§ 907 (g) and 1006 (e). These provisos are significant here.

First, they demonstrate that Congress understood the words "any schedule stating a new rate" to include initial rates, that is, rates filed with the Commission for a service not previously under tariff. If this were not so, a grandfather proviso would have been entirely unnecessary. Second, because Congress grandfathered only rates filed within a specified time period, the inference is strong that initial rates filed subsequent to that period were (and are) subject to suspension. This inference is confirmed by the legislative history of § 316 (g).

As indicated, § 316 (g) as enacted did not contain a cutoff date in the grandfather proviso. In 1938, a cutoff date was provided by amendment. This change was explained by the House Committee Report as follows:

"Sectio[n 16] . . . propose[s] to amend sectio[n] [316 (g)] . . . to permit the Commission to suspend any initial schedule of a common carrier . . . filed after the date that the provisions of the bill shall have become effective. The purpose of the proposed amendment is to prevent future filings of initial tariffs and schedules by motor carriers who were in bona fide operation on June 1, or July 1, 1935, without the exercise by the Commission of its suspension power." H. R. Rep. No. 2714, 75th Cong., 3d Sess., 4 (1938).

While there is no grandfather clause in § 15 (7) itself which would confirm its application to initial rates, Congress was doubtless attempting to recreate the scheme of § 15 (7) in Parts II–IV of the Act and expressly stated this on two occasions. See H. R. Rep. No. 1217, 76th Cong., 1st Sess., 23–24 (1939); H. R. Rep. No. 2066, 77th Cong., 2d Sess., 22 (1942). Moreover, since § 15 (7) is in all respects *in pari materia* with

it has to suspend tariffs. Pointing to the Commission's calculation of rates which it would allow to go into effect during the suspension period, they state that the Commission has set rates without the hearing required by 49 U. S. C. § 15 (1).[33] We disagree.

The reason the Commission has been given power to suspend is to prevent irreparable harm to the public during the

---

§§ 316 (g), 907 (g), and 1006 (e), the plain meaning of the latter sections should be given significant weight in construing the former. See *United States* v. *Freeman*, 3 How. 556, 564–565 (1845); *United States* v. *Stewart*, 311 U. S. 60, 64–65 (1940); *Erlenbaugh* v. *United States*, 409 U. S. 239, 243–244 (1972).

In addition, the fact that §§ 316 (g) and 1006 (e) plainly apply to initial rates defeats petitioners' argument that the word "change" in either § 6 (3) or § 15 (7) of the Act narrows the word "new." Counterparts to § 6 (3) are found in §§ 317 (c) and 1005 (d), each of which, like § 6 (3), states: "No *change* shall be made in any rate . . . except after thirty days' notice . . . ." (Emphasis added.) Since §§ 317 (c) and 1005 (d) are intended to work with §§ 316 (g) and 1006 (e), respectively, in the same way § 6 (3) works with § 15 (7), it is clear that the word "change" does not limit the scope of the suspension power. Similarly, each of §§ 316 (g), 907 (g), and 1006 (e) contains language identical to that added to § 15 (7) by the Transportation Act of 1920, see *supra*, at 649, which again shows that the word "change" cannot be given any restrictive meaning.

[33] Petitioners also argue that, for suspension to be lawful, the Commission had to make a "finding that it would be preferable to defer operation of the Trans Alaska Pipeline rather than to commence operation at the carriers' original rates." Joint Brief for Petitioners 36. We find no basis in the Interstate Commerce Act to support such an argument. Indeed, § 6 (3) of the Act, 49 U. S. C. § 6 (3), authorizes a carrier to submit new tariffs at any time. This authority does not lapse once one tariff for a proposed service is suspended. To the contrary, the Commission cannot refuse to file a tendered tariff simply because it has already suspended other tariffs for the same service. See *American Tel. & Tel. Co.* v. *FCC*, 487 F. 2d 865, 870–881 (CA2 1973). Petitioners, therefore, would require the Commission, in making suspension decisions, to blink at the reality that carriers whose initial rates are suspended will submit interim rates to avoid the almost certain losses that would accrue were the commencement of service postponed altogether.

time when it has under consideration the lawfulness of a proposed rate. See Part II, *supra*. The foundation for a suspension is the Commission's conclusion that a proposed rate is probably unreasonable or unjust. See, *e. g., TAPS,* 355 I. C. C., at 81–82. To make such a determination, the Commission is obviously required to form a tentative opinion about the location of the line between the just and the unjust, the reasonable and the unreasonable. Moreover, the Commission is required by § 15 (7) to set out its reasons in writing for suspending a tariff. The usual and sufficient reason will be that the Commission has found a proposed tariff to fall on the unjust or unreasonable side of the line it has drawn, and it is a reason of precisely this sort that the Commission has given here. See 355 I. C. C., at 81–83.

Petitioners do not apparently disagree that the Commission can suspend a tariff because it falls on the wrong side of the line of reasonableness, but they would prevent the Commission in suspending a tariff from stating, as it did here, where the tentative dividing line lies. Such a statement, they say, is ratemaking. But this is untenable: No principle of law requires the Commission to engage in a pointless charade in which carriers desiring to exercise their § 6 (3) rights are required to submit and resubmit tariffs until one finally goes below an undisclosed maximum point of reasonableness and is allowed to take effect. The administrative process, after all, is not modeled on "The Price is Right." What the Commission did here, therefore, far from being condemnable, is an intelligent and practical exercise of its suspension power which is thoroughly in accord with Congress' goal, recognized in *Arrow,* 372 U. S., at 664–666; see *United States* v. *SCRAP,* 412 U. S. 669, 697 (1973), to strike a fair balance between the needs of the public and the needs of regulated carriers. Indeed, the Commission might well have been derelict in its duty had it insisted on charade once it had determined that there was a way TAPS could operate without harm to the

public. Cf. *Arrow, supra; SCRAP, supra;* 43 U. S. C. § 1651 (a) (1970 ed., Supp. V) (congressional policy favors "[t]he early development and delivery of oil . . . from Alaska's North Slope to domestic markets").

## V

Finally, petitioners contend that the Commission has no power to subject them to an obligation to account for and refund amounts collected under the interim rates in effect during the suspension period and the initial rates which would become effective at the end of such period. They point to the absence of any express authority for such refund provisions and also to the fact that § 15 (7) does provide expressly for refunds in a limited category of circumstances, namely, where there is an "increased rate or charge for or in respect to the transportation of property," which has become effective at the end of a suspension period. This statutory pattern, they suggest, indicates that Congress considered and rejected any broader refund scheme, thereby curtailing any ancillary power to order refund provisions that the Commission might otherwise have.

In response, we note first that we have already recognized in *Chessie* that the Commission does have powers "ancillary" to its suspension power which do not depend on an express statutory grant of authority. We had no occasion in *Chessie* to consider what the full range of such powers might be, but we did indicate that the touchstone of ancillary power was a "direc[t] relat[ionship]" between the power asserted and the Commission's "mandate to assess the reasonableness of . . . rates and to suspend them pending investigation if there is a question as to their legality." 426 U. S., at 514. Applying this test, we found in *Chessie* a direct relationship which justified the Commission in insisting that the proceeds of proposed general railroad rate increases be used to pay for deferred maintenance. If such a use was made of the proceeds,

the rates were reasonable; but they might not be reasonable if put to other purposes. *Ibid.* We also noted that "[d]elay through suspension would only have aggravated the already poor condition of some of the railroads." *Ibid.* Thus, we approved the deferred maintenance condition essentially because it was necessary to strike a proper balance between the interests of the carriers and the interests of the public.

The situation here is very similar. Even a cursory glance at the pleadings before the Commission shows that extended adjudicatory proceedings will be required to resolve the question of precisely what are fair rates. Accordingly, it is not apparent how the Commission could discharge its mandate under § 15 (7) summarily "to assess the reasonableness of [TAPS] rates," 426 U. S., at 514, while considering the interest of the TAPS carriers in beginning operations, unless it could make gross approximations of the sort it made in this proceeding, in which it essentially accepted carrier-supplied data as true and properly included in the TAPS rate base notwithstanding protests to the contrary. See *TAPS, supra,* at 83; *supra,* at 636, and n. 12. But if such approximations are to be used to meet the needs of carriers, it is plain that refund provisions are a necessary and "directly related," *Chessie,* 426 U. S., at 514, means of discharging the Commission's other mandate to protect the public pending a more complete determination of the reasonableness of the TAPS rates.

Thus, here as in *Chessie,* the Commission's refund conditions are a "legitimate, reasonable, and direct adjunct to the Commission's explicit statutory power to suspend rates pending investigation," in that they allow the Commission, in exercising its suspension power, to pursue "a more measured course" and to "offe[r] an alternative tailored far more precisely to the particular circumstances" of these cases. *Ibid.* Since, again as in *Chessie,* the measured course adopted here is necessary to strike a proper balance between the interests of carriers and the public, we think the Interstate Commerce Act should

be construed to confer on the Commission the authority to enter on this course unless language in the Act plainly requires a contrary result.

We turn, therefore, to the language in § 15 (7) on which petitioners rely. This language was not part of the Mann-Elkins Act, but was added by the Transportation Act of 1920. See § 418 of the latter Act, 41 Stat. 484, 487. Section 418 rearranged the paragraphs of § 15 of the Interstate Commerce Act and made numerous modifications to the text of that section. Among other things, § 418 reduced the suspension period created by the Mann-Elkins Act from 10 months to 120 days. According to Commissioner Clark, this change was intended to alleviate complaints by the railroads that the 10-month period too long deprived them of needed revenue in the situation in which proposed rates were ultimately determined to be reasonable. See 1 Hearings on H. R. 4378 before the House Committee on Interstate and Foreign Commerce, 66th Cong., 1st Sess., 30–31 (1919). To protect shippers, the reduction in the suspension period was counterbalanced with a provision authorizing the Commission to require carriers to keep account of and refund amounts collected under tariffs which became effective after a 120-day suspension. See *ibid.* The provisions were summarized in the Report of the Conference Committee which described the provisions of the House bill which provided the text of § 418:

> "[The House bill provided that] as to freight rates the carrier should keep a record in all cases where the commission had not concluded such hearing, and, if the commission finally found the rates too high, the carrier was required to make refunds to the shippers affected." H. R. Conf. Rep. No. 650, 66th Cong., 2d Sess., 66 (1920).

This passage, which declares that Congress sought to protect the public in *"all cases"* in which a hearing had not been concluded by the termination of the suspension period, certainly cannot be read to indicate that Congress placed any

emphasis on the word "increased" or intended to limit the Commission's ancillary powers. Indeed, the House Report on the same bill, H. R. Rep. No. 456, 66th Cong., 1st Sess., 20–21 (1919), appears to refer to "increased" rates only to distinguish them from "decreased" rates, over which the 1920 Act for the first time gave the Commission some authority by conferring power to set minimum rates, see *id.*, at 19, and as to which there is no need to create a refund procedure to protect shippers. From this very sketchy history, therefore, it seems that Congress' purpose was to create a remedy less cumbersome than the reparations procedure to protect shippers whenever they could be harmed due to the shortened suspension period created by the 1920 Act. See *Arrow,* 372 U. S., at 665–666. Accordingly, we conclude that nothing in the Transportation Act precludes what the Commission has done here and, moreover, that the Commission's actions are completely consistent with what Congress intended when it drafted the 1920 Act.

VI

For the reasons stated above, the judgment below is in all respects

*Affirmed.*

MR. JUSTICE POWELL took no part in the consideration or decision of these cases.