WESTINGHOUSE ELECTRIC CORPORATION, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 86–1249, 86–1333.

United States Court of Appeals, Seventh Circuit.

Jan. 13, 1987.

---

Walter P. DeForest, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for petitioner.

David Fleischer, N.L.R.B., Washington, D.C., for respondent.

Before POSNER, COFFEY and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Westinghouse Electric Corp. repairs and rebuilds electric generators, transformers, motors, and other apparatus at more than 60 locations around the country. The employees of a little more than half of these are represented by unions. The United Electrical, Radio and Machine Workers of America (the Union) negotiates with Westinghouse concerning the employees in Chicago, Seattle, and Detroit, the three apparatus shops involved in this case.

The Union negotiated a national agreement with Westinghouse under which the workers are placed in grades. A grade 10 employee will do more skilled work, on average, than a grade 9 employee, and be paid more. The hourly rate for each grade is established by "key sheets" negotiated locally. Each repair job or operation also is graded. Work requiring grade 10 skills usually is assigned to employees of grade 10 or higher. On occasion work is assigned to employees whose permanent grades are lower than the skill level required for the job; in that event, the hours devoted to the job will be paid at the higher rate rather than the employee's regular rate. This process, called a "temporary rate adjustment", is a ratchet; an employee is not paid at a lower rate for doing work simpler than his regular grade entails.

Between 1981 and 1983 the revenues of Westinghouse's repair operations fell from $174 million to $135 million; in 1983 the operations had a net operating loss of $7.8 million. Labor costs are the principal expenses of a repair business, so Westinghouse decided to reduce them. Its contracts with the Union ran through July 1985, however, and the Union was not keen on reducing its members' income. Managers at Westinghouse instructed the head of each apparatus repair shop to reduce that shop's "average earned rate" (wages plus the value of fringe benefits) by $1.70 per hour. One memorandum said:

There are many ways to accomplish this task. The most "results" oriented

practice to reduce your average earned rate in each plant would be to redistribute your labor grades. Other examples of methods to supplement the effect of redistribution would be to cut back on group leader pay or night shift premium. "Redistribution" is a euphemism for a reduction in average grade levels. The collective bargaining agreements fixed the rate of pay for each grade, but they did not fix the number of employees in each grade. One way to achieve a "redistribution" in grades would be to reduce the grade level of every worker in the plant, and with it the hourly wage. Another would be to lay off the workers in the higher grade levels and allow these workers—often with the most seniority in the plant—to "bump" the workers on lower levels, who would in turn bump those below them, and so on through the roster. The problem is that either the demotion method or the layoff method produces a result that is functionally identical to a reduction in hourly pay for the same employees. The Union charged that Westinghouse had committed unfair labor practices, in violation of § 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5). The administrative law judge found that Westinghouse had violated § 8(a)(5) by breaking its agreements with the Union, and the Board adopted the ALJ's opinion, adding only two footnotes.

The gist of the ALJ's opinion is that Westinghouse set out to, and did, reduce its average hourly wage. Because it could not do this explicitly, the indirect method of "redistributing" grade levels also must be a breach of contract. The ALJ fortified his finding that the demotions were a ruse for evading the collective bargaining agreements by observing that each employee did the same work after the demotion as before. Yet the ALJ also concluded that the demotions at Detroit were lawful. This is so, he reasoned, because they had been carried out in the form of layoffs. The plant laid off some workers and recalled them to lower grades. Other workers were demoted, and in the process at least one job vanished. The ALJ thought that the contract permitted a recall to any grade, and he also dismissed the claims of employees demoted at Detroit without being laid off.

◼ The curious result is that so long as Westinghouse gets rid of an employee, it may do whatever it likes with grade distributions, while if it manages to keep everyone on the payroll, it may not reduce anyone in grade (at least not without charging and proving inability to perform the work of the grade). The ALJ has read the agreement to give each employee tenure in his grade as well as seniority in the plant—unless Westinghouse lets someone, anyone, go, in which case no one has tenure. This is an implausible reading of a labor agreement, and the ALJ did not identify the language that supports such a reading.

Neither the national nor the local agreements mention assignments of workers to grades. The national agreement has a management-rights clause, so vague it could mean anything or nothing. This one states: "The Union recognizes that it is the responsibility of the Company and its Plant Managements to maintain plant efficiency and agrees that Management shall have the freedom of action necessary to discharge its responsibility for the successful operation of the Company. This responsibility includes ... the determination of the products to be manufactured and the production schedules." See also *Dreis & Krump Mfg. Co. v. Machinists*, 802 F.2d 247, 252 (7th Cir.1986). The agreement is silent on the tenure of employees in grades, so each side is driven to analogy. The Union and the ALJ analogize the "redistribution" to a reduction in hourly wages; Westinghouse analogizes it to a layoff of the people in the highest grade, followed by the bumping of less senior employees. The Union's preferred analogy is supported by many memoranda urging plant managers to depress their average wages, not caring much about methods or justifications. Westinghouse's preferred analogy is supported by the fact that in assigning new grades at the Chicago and Seattle plants, the managers followed the agree-

ment's "Employee Security and Protection Plan", allowing more senior employees the privilege of displacing others and offering any worker whose salary was reduced more than 10% the option of being laid off.

If this were nothing but a battle of characterizations, we would defer to the Board's. There is rarely a "right" characterization of a complex pattern. Yet on the way to a characterization the Board must meet the competing arguments and avoid material errors of logic. The ALJ's disposition of this case, and therefore the Board's, is troubling because of the suppressed assumption that the collective bargaining agreement forbids any indirect method of reducing wages. This is the fulcrum of the ALJ's analysis. Yet the contract does not say this, and the ALJ contradicted his central assumption when he implicitly concluded that Westinghouse may reduce the grade level of every employee so long as at least one is let go. The law is full of instances in which people may choose among means to an end, even though one means is forbidden or more costly than another. For example, a merger, an acquisition of assets, and an acquisition of stock may be functionally identical, yet the securities and tax laws will treat them very differently. E.g., *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985). State law may require a vote to carry out a corporate merger but allow a sale of assets without a vote. *Hariton v. Arco Electronics, Inc.*, 41 Del.Ch. 74, 188 A.2d 123 (1963); see also *Frandsen v. Jensen-Sundquist Agency, Inc.*, 802 F.2d 941 (7th Cir.1986). A bond indenture may require a premium payoff or an opportunity to convert debt to stock on sale of the company's assets, but if the transaction is accomplished by merger the bondholders may be out of luck. See *Broad v. Rockwell International Corp.*, 642 F.2d 929 (5th Cir.), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981) (en banc); *Field v. Allyn,* 457 A.2d 1089 (Del.Ch.1983) (the "equal dignity" principle allows managers to select the least-restricted method to carry out a corporate transaction). An administrative agency that lacks the power to regulate a transaction directly may be able to do so indirectly by establishing conditions on the exercise of its admitted powers. See *Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 654–56, 98 S.Ct. 2053, 2066–67, 56 L.Ed.2d 591 (1978).

Whether a contract or law forbids indirect means to a given end is a question of construction, to be settled by examining the language, structure, history, and functions of the contract or law. To the extent the ALJ looked at these, he produced contradictory results, as we have discussed. It is difficult to believe that this collective bargaining agreement forbids all acts that reduce average wages. It does not forbid layoffs, which reduce wages drastically, or selective layoffs of the employees in the most highly paid grades. It does not forbid elimination of the grades with the highest pay. And it would not be in the interest of the parties to forbid adjustments in light of changing work. Suppose a plant has 40 repair workers and two sources of business: a huge oil-fired electric generating plant that needs complex repair work on its turbines, and businesses that need simple repair work on their air conditioners. Suppose also that each source of business occupies the time of 20 workers. The plant would have 20 workers in grade 10 (complex work) and 20 workers in grade 5 (simple work). If the oil-fired generating plant were to shut down, Westinghouse would need to trim its staff. If the junior workers in the plant are also those in grade 5, a simple layoff based on seniority would leave the plant with 20 workers earning grade 10 wages and doing grade 5 work. That is a formula for disaster; the wages must be reduced, or the remaining 20 workers must be laid off too—something neither workers nor management desire, if the remaining work is enough to keep the plant in business. The appropriate end position is 20 workers doing grade 5 work at grade 5 wages. It could be achieved by laying off the junior workers and demoting the senior workers to grade 5—yet the ALJ construed the agreement as forbidding this

unless done simultaneously with the layoff. So if Westinghouse should "lay off" the grade 10 workers and let them bump the others out of their jobs, that would be permitted under the ALJ's reading; but if Westinghouse first laid off the grade 5 workers, tried to make a go of the shop, and only later found that it had to demote the grade 10 workers, that would be forbidden. Nothing in the language or history of this agreement suggests such a self-defeating meaning.

That the agreement allows demotions in response to a change in the average difficulty of a plant's work does not establish whether such a change occurred. Westinghouse's revenues fell rapidly, but perhaps the average difficulty of the work was unaffected. In that event, the ALJ would have been entitled to infer that the "redistribution" of grades was a sham, a method of reducing wages in violation of contract. The ALJ evidently thought the demotion a sham, for although he never said so expressly he found that (a) the employees did the same work before and after the "redistribution" of grades; (b) the number of "temporary rate adjustments" approximately doubled after the "redistribution"; and (c) Westinghouse's claim that the redistributions undid "grade creep" is unavailing. These findings regrettably do not respond to the issues in the case and therefore do not support the decision.

The observations that the assigned work did not change and that the number of "temporary rate adjustments" did are consistent with a gradual reduction in the average difficulty of work. Suppose in 1981 the average grade 10 worker at one of Westinghouse's plants spent 80% of his time doing grade 10 work, 10% doing more difficult work, and 10% doing less difficult work. He would receive "temporary rate adjustments" for the 10% of his time he did the more difficult work. If by 1984 the average difficulty of work in the plant had fallen, the same worker—still in grade 10— might be spending 20% of his time doing grade 8 work and 80% doing grade 7 work. If his classification were reduced to grade 7, he would continue doing the same work

he had been. (After all, nothing about the reclassification changed the volume or kind of work customers hired Westinghouse to do.) But as a grade 7 worker, he would be spending 20% of his time doing work of a higher grade, thus receiving more "temporary rate adjustments". For all the ALJ's opinion tells us, this is exactly what happened. Grades were reduced, each person's work assignments were unaffected, and the number of "temporary rate adjustments" increased—all in response to a reduction over a period of years in the average difficulty of work.

As for "grade creep": if Westinghouse's principal argument had been grade creep, the ALJ would have been entitled to reject it. Grade creep is a slow upward movement in grades without a corresponding change in the difficulty of work. Gradual movement ("creep") in assigned grades should be offset by gradual changes in the key sheets fixing the wages for the job. A five percent increase in the average shopwide grade may be a substitute for a five percent increase in wages on the key sheets. Because the wage rates are (or can be) responsive to grade creep, the ALJ was entitled to conclude that the employer may not use grade creep a second time to make grade adjustments. The problem is that the ALJ misunderstood Westinghouse's arguments. "Grade creep" is an increase in the average grade while the work remains the same. We have examined the briefs Westinghouse filed before the ALJ and the Board; Westinghouse argued that the grades had remained stable while the difficulty of work decreased. Like "grade creep" this produces a divergence between the worker's assigned grade and the difficulty of the work, but the mechanism is different, and the difference has implications for the appropriate response under the contract.

The question that must be answered to resolve this case is whether the average difficulty of work at Westinghouse's plants decreased, as it claimed, making a reduction in average labor grade appropriate (or at least not a subterfuge). Neither the

ALJ nor the Board addressed that question. Some evidence in the record supports Westinghouse's position. Several witnesses testified that the work Westinghouse had lost between 1981 and 1983 was predominantly the more difficult work. This implies a reduction, perhaps substantial, in average difficulty. At the same time Westinghouse was laying off some of its workers by seniority. If the junior employees were also assigned to the lower wage grades, the average grade of the remaining employees increased at the same time the average difficulty of work was reduced. (This is not "grade creep"; the average goes up even though each person's grade is unchanged.) The result could have been an impressive gap between wage grades and difficulty of work, calling for correction. The lack of complaint about the new grade assignments corroborates this way of looking at things. Although the Union protested the reduction in grades (and therefore average wages), neither the Union nor any of the employees claimed that Westinghouse put the workers in grades too low for the work assigned. Even though many workers' grades have been reduced substantially (say, from grade 10 to grade 5), none has filed a grievance contending that his new grade does not reflect the work he is doing. (When they do more difficult work, they are paid at higher rates.) This—coupled with the ALJ's finding that each worker did the same work after the "reclassification" as before—imples that most of the employees had been doing work well below their permanent grade assignments.

We do not say that the ALJ or the Board was required to credit this evidence. The drawing of inferences is for the agency rather than the courts. During the trial the ALJ expressed skepticism about Westinghouse's position, repeatedly inquiring whether any records showed, by plant or by worker, the distribution of work by difficulty. Westinghouse kept no such records. Perhaps this shortfall would have justified a decision against Westinghouse. But the ALJ did not mention this in his written opinion. The agency is required to deal with the evidence. The ALJ did not. Neither did the Board. Westinghouse filed substantial briefs, almost entirely devoted to explaining how the ALJ had not come to grips with Westinghouse's position. To this the Board replied:

> In his decision, the [ALJ] made some minor factual errors which we correct. Contrary to the [ALJ's] statement, a proposal to revise the key sheet rates was rejected only by Local 1002 representing employees at the Seattle facility. Similar proposals were not made at the other two plants. Ronald Landess was not among the employees demoted at the Chicago facility. Seattle Plant Manager Hammond met with officials of Local 1002 on 21 February 1984, not 1983. Finally, we correct the spelling of Local 1105 President Samuel Minniefield's name.

That is the Board's whole discussion of facts and inferences. Doubtless the Board does not have time to write a full opinion in every case. See *Automobile Workers v. NLRB*, 802 F.2d 969, 972 (7th Cir.1986). But why, oh why, does it spend time correcting spelling mistakes while ignoring the only substantial issue in the case? The Board's "opinion" in this case is a burlesque of bureaucratic behavior, attending to trivia at the expense of substance. The deference courts give to the Board comes from the fact that the agency has made the hard decision; there is little to be gained and much to be lost from weighing the same evidence again. Cf. *Anderson v. City of Bessemer City*, 470 U.S. 564, 574–75, 105 S.Ct. 1504, 1512–13, 84 L.Ed.2d 518 (1985); *Mucha v. King*, 792 F.2d 602, 605–06 (7th Cir.1986); *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1427–29 (7th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1801, 90 L.Ed.2d 346 (1986). It is difficult to believe that the Board gave this case serious consideration.

Having criticized the Board, we must do the same to Westinghouse's lawyers in this court. Fed.R.App. 28(g) limits the number of pages in a party's opening brief, unless the court grants permission to file a longer

brief. We do not grant such motions often, see *United States v. Devine*, 768 F.2d 210 (7th Cir.1985) (en banc), and we denied Westinghouse's. Counsel nonetheless filed a brief as long as the motion had requested, although they tried to disguise the excess by a variety of typographical techniques.* This presents a serious question about how lawyers respond to this court's orders. We expect counsel to respond to our orders by complying rather than seeking ways to evade them. In this case counsel tried to evade both the appellate rules and our order.

■ The lawyers, caught with their hands in the cookie jar, have apologized and promised not to play the same trick on us again. Perhaps they have learned their lesson. We cannot exclude the possibility that all of this was simply negligent inattention to the appellate rules. We have encountered similar problems in other cases recently, however, and there have been other efforts to evade the rules. See *Morgan v. South Bend Community School Corp.*, 797 F.2d 471, 480–81 (7th Cir.1986). Lawyers must comply with the rules and our orders rather than hope to put one over on the court and to apologize when caught. The penalty for a violation should smart. Even if only negligence was at work, counsel must learn to be alert. The offense here "multiplied the proceedings" by requiring the judges and counsel for the Board to examine two sets of briefs for Westinghouse. We accordingly use our power under 28 U.S.C. § 1927 and impose a penalty of $1,000. Counsel may not pass this penalty on to Westinghouse.

The petition for review of the Board's decision is granted, and the cross-application for enforcement is denied. The case is remanded to the Board for further proceedings consistent with this opinion.

---

* Fed.R.App.P. 32(a) requires typed briefs to be double-spaced and to observe specified margins. Briefs also must have type 11 points or larger, ruling out elite type. Westinghouse disregarded all of these rules. It filed a brief with approximately 1½ spacing, with type smaller than 11 points, and with margins smaller than those allowed. The effect was to stuff a 70–page brief into 50 pages. One has the sense that the law-

yers wrote what they wanted and told the word processing department to jigger the formatting controls until the brief had been reduced to 50 pages. Our clerk's office did not catch the maneuver. The judges did, and when we required Westinghouse to file a brief complying with the rules counsel responded by moving gobs of text into single-spaced footnotes, thereby leaving essentially the same number of words in the brief.