Michael DONOVAN, William Ford, James Kazel and Judy Keogh, Plaintiffs,

v.

FEDERAL BUREAU OF INVESTIGATION, Defendant.

No. 82 Civ. 4776(RWS).

United States District Court, S.D. New York.

Aug. 12, 1983.

On Motion for Reconsideration Feb. 8, 1984.

---

Paul, Weiss, Rifkind, Wharton & Garrison, Lawyers Committee for Intern. Human Rights, New York City, for plaintiffs; Allan Blumstein, Michael C. Lasky, James Thornton, Mary Lu Bilek, Michael H. Posner, Diane Orentlicher, New York City, of counsel.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for defendant; Edward G. Williams, Steven E. Obus, Asst. U.S. Attys., New York City, of counsel.

## OPINION

SWEET, District Judge.

Plaintiffs in this action are next-of-kin of four American churchwomen—Maureen Clarke, Jean Donovan, Ita Ford and Dorothy Kazel—who were murdered in El Salvador on December 2, 1980. After exhausting their administrative remedies, plaintiffs brought this suit under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to compel the disclosure of documents originated by the Federal Bureau of Investigation ("FBI")[1] in the course of its investigation into the murders. The parties have cross-moved for partial summary judgment pursuant to Rule 56 Fed.R.Civ.P. The narrow issue before the court on these motions is the applicability of the FOIA Exemption 7(A), 5 U.S.C. § 552(b)(7)(A).[2] The absence of authority on the subject and the sensitivity of any portion of the

1. It should be noted that plaintiffs have also brought suits under the FOIA against the Department of State, 82 Civ. 4287 (S.D.N.Y.1982), the Defense Intelligence Agency, 82 Civ. 4767 (S.D.N.Y.1982), the National Security Agency, 83 Civ. 478 (S.D.N.Y.1983), and the Central Intelligence Agency, 83 Civ. 479 (S.D.N.Y.1983).

2. Section 552(b) in its entirety provides:
This section does not apply to matters that are—
(1)(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order;
(2) related solely to the internal personnel rules and practices of an agency;
(3) specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

mosaic which makes up the relationship between the United States and El Salvador add significance to what is by the nature a difficult question. For the reasons set forth below, plaintiffs' motion is granted to the extent indicated herein and defendant's motion is denied.

*Background*

██ According to the Government, in order to assist the investigative and prosecutive efforts undertaken by the government of El Salvador in connection with the murders of the four American women, the FBI provided investigative advice to the American Embassy officials and to responsible El Salvadoran authorities. The FBI has also provided, upon request, laboratory services and other technical assistance to the government of El Salvador.[3] Although a trial against those charged with the murders appears to be contemplated by the El

(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;
(5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;
(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;
(7) investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings, (B) deprive a person of a right to a fair trial or an impartial adjudication, (C) constitute an unwarranted invasion of personal privacy, (D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source, (E) disclose investigative techniques and procedures, or (F) endanger the life or physical safety of law enforcement personnel;
(8) contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or
(9) geological and geophysical information and data, including maps, concerning wells. "Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."

At the first pretrial conference held on October 19, 1982, plaintiffs requested that the FBI be ordered to prepare a detailed index to identify the withheld documents and enumerate each of its claimed exemptions, in accordance with the procedure set forth in *Vaughn v. Rosen,* 484 F.2d 820 (D.C.Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). The Government took the position that Exemption 7(A) justified the withholding of all documents responsive to plaintiffs' FOIA request, and the FBI was permitted to submit an affidavit addressing the applicability of this exemption alone. The Government claims that the requested documents may be independently exempt from disclosure pursuant to other sections of the FOIA, including Exemption 1, 5 U.S.C. § 552(b)(1), *supra,* and does not waive its claims under these other exemptions by not raising them in its current motion.

3. Because the FBI has no authority to investigate criminal acts which take place outside the jurisdiction of the United States, the FBI's involvement in this investigation was predicated upon a request by the Department of State pursuant to 28 U.S.C. § 533(3) that FBI assistance be provided to the Government of El Salvador. 28 U.S.C. § 533(3) provides:

The Attorney General may appoint officials—
(3) to conduct such other investigations regarding official matters under the control of the Department of Justice and the Department of State as may be directed by the Attorney General.

The Director of the FBI has been so designated pursuant to 28 C.F.R. §§ 0.85(a) & (g) (1982), which provide as follows:

The Director of the Federal Bureau of Investigation shall:
(a) Investigate violations of the laws, including the criminal drug laws, of the United States and *collect evidence in cases in which the United States is or may be a party in interest,* except in cases in which such responsibility is by statute or otherwise specifically assigned to another investigative agency....
(g) Operate the Federal Bureau of Investigation Laboratory to serve not only the Federal Bureau of Investigation, but also to provide, without cost, technical and scientific assistance, including expert testimony in Federal or local courts, for all duly constituted law enforcement agencies, other organizational units of the Department of Justice, *and other Federal agencies, which may desire to avail themselves of the service.* As provided for in procedures agreed upon between the Secretary of State and the Attorney General, *the services of the Federal Bureau of Investigation Laboratory may also be made available to foreign law enforcement agencies and courts.*

Salvadoran government, this record does not indicate if and when such a trial will commence.

In response to plaintiffs' FOIA request, the FBI has concluded that plaintiffs seek the disclosure of approximately 180 documents (consisting of some 600 pages) which relate to the technical and other investigative assistance provided by the FBI to the El Salvadoran authorities. The documents include fingerprint examinations, ballistics tests, polygraph examinations and other laboratory examinations, as well as the results of interviews by the FBI in El Salvador and in the United States. In his first declaration, Douglass C. Ogden ("Ogden"), Special Agent of the FBI, has defined the generic categories of the documents which have been withheld, i.e., "teletypes", "airtels", "laboratory reports" and "letterhead memorandum", with little description of the contents of the documents. In a second declaration submitted after oral argument, Ogden sought to specify how release of the requested documents would interfere with the El Salvadoran proceedings.

A January 20, 1983 State Department telegram sent to plaintiffs indicates that the presiding judge of the trial in El Salvador and the Fiscal General (the Chief Prosecutor) reported that they had no objection to the plaintiffs obtaining the complete FBI test results. On or about January 6, 1983, counsel for plaintiffs and plaintiff William Ford traveled to El Salvador and met with the presiding judge and Fiscal General concerning the prosecution of the individuals responsible for the murders of the four churchwomen. In his affidavit, counsel for plaintiffs states that the Fiscal General advised him that his office neither possessed nor would seek to obtain any documents or physical evidence collected by the FBI relating to the killings. The Fiscal General also advised that under El Salvadoran law, only evidence obtained under the supervision of a judge within territorial limits of

El Salvador may be introduced at trial. Consequently, the plaintiffs claim, the results of the FBI's ballistics tests, polygraph tests, fingerprint analyses and other technical studies prepared in the FBI's laboratory in Washington, D.C., are likely to be excluded from trial unless such tests can be reproduced in El Salvador. The Fiscal General informed counsel for plaintiffs that such reproduction would be virtually impossible.

In its papers and at oral argument, the Government took the position that only the El Salvadoran government "has the final word with respect to the officials' claimed nonobjection to disclosure," and that the statements made by the presiding judge and Fiscal General were not dispositive. However, some time in the middle of June, 1983, the Assistant United States Attorney in this matter communicated to the court that the El Salvadoran government had informed the State Department that it did not oppose the release to one of the plaintiffs of certain material compiled by the FBI. At that time, the Government withdrew this motion. Several days later, the Assistant United States Attorney communicated that the FBI decided not to withdraw the motion and wanted to pursue its claim under Exemption 7(A). The court directed that the Government submit an affidavit clarifying the matter.

On July 5, 1983, a declaration of D.F. Martell ("Martell"), Special Agent of the FBI, was submitted. The declaration provides:

Recently, the FBI received a communication for the United States Department of State advising that the Government of El Salvador did not oppose the release of certain material compiled by the FBI. Specifically, the State Department advised that Dr. Mario Adalberto Rivera, the Attorney General of El Salvador, did not oppose the release of laboratory examinations and polygraph tests conduct-

(emphasis added). In this connection, the Government also cites 18 U.S.C. § 3184 which establishes the procedure for the arrest, detention, and extradition of persons found within

the United States who have been charged with an extraditable offense in a country with which the United States has "a treaty or convention for extradition."

ed by the FBI in the investigation into the deaths of the four churchwomen to William Ford, brother of Ita Ford, one of the churchwomen.

Since receipt of the aforementioned communication, consideration has been given by the FBI to withdrawal of its assertion of (b)(7)(A) and to the release of whatever material is not exempt under other provisions of the FOIA. As a result, the FBI believes clarification should be sought from Dr. Rivera regarding his lack of opposition to the release of this material to a relative of one of the slain churchwomen. The FBI believes Dr. Rivera should be queried as to whether or not he is aware that release to anyone, including the relatives of the four churchwomen, constitutes a general release under the FOIA and, consequently, requires the same information to be released to other individuals who have already requested it and to any making a subsequent similar request.

Further, if Dr. Rivera is not aware of this, then the FBI needs to know or he should advise what impact such a release would have on prospective enforcement proceedings. Therefore, at least until these concerns have been addressed by Dr. Rivera, exemption (b)(7)(A) will continue to be asserted.

The FBI did not state that Dr. Rivera would be "queried," nor has it indicated that Dr. Rivera has been "queried."

On July 26, 1983, counsel for plaintiffs submitted an affidavit in response to Martell's declaration. Counsel met with Dr. Rivera in El Salvador on July 6, 1983, and informed him of the FBI's desire to make certain that Dr. Rivera understood the implications of his consent to the release of the documents. Counsel states he was told by Dr. Rivera that he "has absolutely no objection to the release of the documents under any circumstances."

Under El Salvadoran law, plaintiffs are entitled to hire an attorney called an *accusador particular* to function as a type of adjunct prosecutor to represent their interests in the prosecution of the case. *See* 38 *Record* 112, 139 n. 1 (March 1983). As a preliminary step toward this end, plaintiff William Ford submitted a "Declaration of an Injured Person" to the presiding judge, at the request of the Fiscal General, "to assist the court in bringing to justice all the individuals who are responsible for this crime."

*Discussion*

▉ The Freedom of Information Act sets forth a policy of broad disclosure of government documents in order "to ensure an informed citizenry, vital to the functioning of a democratic society." *FBI v. Abramson*, 456 U.S. 615, 621, 102 S.Ct. 2054, 2059 (1982) (citing *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242, 98 S.Ct. 2311, 2326, 57 L.Ed.2d 159 (1978); *EPA v. Mink*, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973)). In *Abramson*, the Supreme Court explained that although the FOIA favors broad disclosure, Congress, through Exemption 7, recognized that certain information is entitled to protection:

[C]ongress realized that legitimate governmental and private interests could be harmed by release of certain types of information and provided nine specific exemptions under which disclosure could be refused. Here we are concerned with Exemption 7, which was intended to prevent premature disclosure of investigatory materials which might be used in a law enforcement action. This provision originally exempted "investigatory files compiled for law enforcement purposes except to the extent available by law to a private party." A sweeping interpretation given the exemption by some courts permitted the unlimited withholding of files merely by classifying them as investigatory files compiled for law enforcement purposes. As a result, the exemption underwent a major revision in 1974. As amended, Exemption 7 authorizes disclosure of law enforcement records unless the agency can demonstrate one of six specific harms.

456 U.S. at 621, 102 S.Ct. at 2059. Exemption 7 now protects:

investigatory records compiled for law enforcement purposes but only to the extent that production of such records would (A) interfere with enforcement proceedings, (B) deprive a person of a right to a fair trial or impartial adjudication, (C) constitute an unwarranted invasion of personal privacy, (D) disclose the identity of a confidential source, and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source, (E) disclose investigative techniques and procedures, or (F) endanger the life or physical safety of law enforcement personnel.

5 U.S.C. § 552(b)(7). Judicial review of an asserted Exemption 7 privilege requires a two-part inquiry: first, a requested document must be shown to have been an investigatory record "compiled for law enforcement purposes," and second, if so shown, the agency must demonstrate that release of the material would have one of the six results specified in the Act. *FBI v. Abramson, supra,* 456 U.S. at 622, 102 S.Ct. at 2059 (footnote omitted).

The current motions for partial summary judgment present a novel issue of law, namely whether Congress intended investigatory records "compiled for law enforcement purposes" to encompass investigatory records compiled for *foreign* law enforcement purposes.

Plaintiffs contend that the Government has failed to meet the first prong of the Exemption 7(A) test in that Exemption 7 applies only to federal law enforcement records, which plaintiffs define as records compiled by a federal agency for the purpose of investigating violations of federal law. Their argument is not unlike that made by plaintiff and rejected by the court in *Wojtczak v. Department of Justice,* 548 F.Supp. 143 (E.D.Pa.1982), the only case cited by the parties which considers the applicability of Exemption 7 to law enforcement other than federal law enforcement.

In *Wojtczak,* plaintiff brought an action pursuant to the FOIA seeking to compel the disclosure of information withheld by the FBI in response to his request for all FBI documents pertaining to him. The documents contained results of laboratory tests which the FBI conducted at the request of local law enforcement authorities in connection with plaintiff's trial on state charges of rape. The FBI claimed that the documents were exempt under 5 U.S.C. § 552(b)(7)(D). Plaintiff argued that Exemption 7 applies only to investigatory records compiled for federal law enforcement, and not to records pertaining to state law enforcement activity. *Id.* at 145. The court held that nothing in Exemption 7 caselaw, the language of Exemption 7 or the legislative history of Exemption 7 limits its scope to federal law enforcement. *Id.* at 147–48. The analysis employed in *Wojtczak* is useful in this case.

In support of their argument that Exemption 7 covers only records compiled for the purpose of enforcing federal law, plaintiffs cite several cases. *See, e.g., Pratt v. Webster,* 673 F.2d 408, 420 (D.C.Cir.1982) ("the agency's investigatory activities must be related to the enforcement of federal laws ..."); *Church of Scientology v. Department of the Army,* 611 F.2d 738, 748 (9th Cir.1979) ("an agency which has a clear law enforcement mandate, such as the FBI, need only establish a 'rational nexus' between enforcement of a federal law and the document for which an exemption is claimed"); *Malizia v. Department of Justice,* 519 F.Supp. 338, 347 (S.D.N.Y. 1981) (Weinfeld, J.) ("to meet this requirement an agency must demonstrate at least 'a colorable claim of a rational nexus' between activities being investigated and violations of federal laws"); *Lamont v. Department of Justice,* 475 F.Supp. 761, 773 (S.D.N.Y.1979) (Weinfeld, J.) ("the appropriate test is whether the records indicate that the agency was gathering information with the good faith belief that the subject may violate or has violated federal law, or was merely monitoring the subject for purposes unrelated to enforcement of federal

law"). However, all of these cases involved federal criminal investigations. None focused on the question of whether Exemption 7 applies to all law enforcement investigatory records contained in the files of federal agencies or whether it applies only to the law enforcement records concerning federal crimes. There is nothing in the reasoning of those decisions to indicate that the references to federal law enforcement in connection with Exemption 7 had to do with anything more than the fact that those cases involved federal law.

Similarly, with respect to Exemption 7 legislative history which is sparse indeed, *see Campbell v. Department of Health & Human Services,* 682 F.2d 256, 261 (D.C. Cir.1982) (citing *FBI v. Abramson, supra,* 456 U.S. at 633, 102 S.Ct. at 2065 (O'Connor, J., dissenting), the plaintiffs' citations do little more than show that Congress did not specifically address the question of foreign law enforcement. References to "crime rising in this country," House Committee on Government Operations and Senate Committee on the Judiciary, 94th Congress, 1st Session, Freedom of Information Act and Amendments of 1974 (P.L. 93–502) *Source Book: Legislative History, Texts, and Other Documents,* 479 (Jt.Comm. Print, 1975) (remarks of Sen. Clark) ("1975 *Source Book*"), and "fighting the growing menace of crime in America," 1975 *Source Book* at 406 (remarks of Sen. Hart), simply demonstrate that Congress' immediate concern was that disclosure under the FOIA had to be tempered by the need to fight crime in this country. The legislative history, however, is devoid of any message that Congress intended to limit "law enforcement" for Exemption 7 purposes to federal law enforcement in this country. Similarly, with respect to the Attorney General's Memorandum on the 1974 FOIA Amendments which provides that an agency should produce investigatory records except where the purpose for which the agency holds or uses the records "becomes substantially violation-oriented, *i.e.,* becomes re-focused on preventing, discovering or applying sanctions against noncompliance with federal statutes or regulations," 1975

*Source Book* at 516, the memorandum does not indicate that the Attorney General at any time considered and offered an opinion on the issue currently before the court. *Cf. Wojtczak v. Department of Justice, supra,* 548 F.Supp. at 147 (Exemption 7's applicability to records involving FBI aid to local law enforcement agencies).

Turning to the plain language of the statute, Exemption 7(A) exempts from the FOIA disclosure "records compiled for law enforcement purposes" where disclosure would interfere with enforcement proceedings. The FOIA does *not* stay "records compiled for federal law enforcement purposes," nor does it make any distinction between federal and foreign law enforcement. *Cf. Wojtczak v. Department of Justice, supra,* 548 F.Supp. at 147 (no distinction between federal and local law enforcement). Aware that "the notion that because the words of a statute are plain its meaning is also plain is merely pernicious oversimplification," *United States v. Monia,* 317 U.S. 424, 431, 63 S.Ct. 409, 412, 87 L.Ed. 376 (1943) (Frankfurter, J., dissenting), it remains my duty "to find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and the general purposes that Congress manifested." *FBI v. Abramson, supra,* 456 U.S. at 625, 102 S.Ct. at 2061 n. 7 (quoting *NLRB v. Lion Oil Co.,* 352 U.S. 282, 297, 77 S.Ct. 330, 338, 1 L.Ed.2d 331 (1957) (Frankfurter, J., concurring and dissenting).

In *Scientology v. Department of Justice,* 612 F.2d 417 (9th Cir.1979), the Ninth Circuit noted that "words used in a statute are to be given their ordinary meaning in the absence of persuasive reasons to the contrary." *Id.* at 420 n. 10 (citing *Trans Alaska Pipeline cases,* 436 U.S. 631, 98 S.Ct. 2053, 56 L.Ed.2d 591 (1978); *Banks v. Chicago Grain Trimmers,* 390 U.S. 459, 88 S.Ct. 1140, 20 L.Ed.2d 30 (1968)). The plaintiffs have not set forth any persuasive reasons for not giving the language of Exemption 7 its plain meaning. Plaintiffs do suggest that

under the construction of Exemption 7(A) adopted here, courts will be required to engage in the difficult tasks of first analyzing foreign law and then determining the extent that the release of certain documents would impede a foreign law enforcement proceeding. The presence of difficult issues is not, of course, sufficient to reject an interpretation that accords with congressional intent. Interpretation of foreign law, while frequently no easy task, is dealt with on occasion by federal courts. *See, e.g., Corporacion Venezolana de Fomento v. Vintero Sales Corporation,* No. 76 Civ. 1671 (S.D.N.Y.1982), *aff'd,* 712 F.2d 33 (2d Cir.1983) (per curiam); Rule 44.1 Fed.R.Civ.P. The Government, of course, bears the burden of proving the applicability of a claimed exemption.

As explained by the FBI, because the victims were American citizens and because of the intense public reaction in the United States, our government became heavily involved in supporting the efforts of El Salvador to identify and bring to trial the perpetrators of those crimes. It is undisputed that the FBI investigation undertaken and lab tests performed which generated the documents requested by plaintiffs involve law enforcement, that is, the investigation and prosecution of the murder of four American churchwomen in El Salvador. In *Wojtczak,* the court found that the detrimental effect which disclosure of the records would have on the FBI's long-standing practice of assisting state and local police was a strong policy consideration supporting its interpretation of Ex-

emption 7. *See* 548 F.Supp. at 147. An analogous consideration is equally strong here where FBI activities are undertaken in cooperation with other federal agencies and foreign law enforcement agencies, *see* note 3 *supra.* The FBI's aid to these authorities presumably benefits the United States both at home and abroad, particularly in a case such as this where the lives of Americans were taken abroad. The FBI does participate in law enforcement in other countries, and much of the information prepared for other federal agencies in connection with such law enforcement as well as for foreign law enforcement agencies is likely to contain sensitive information which might interfere with enforcement, information which the agencies and parties to the investigation would not want disclosed to the general public or the subjects of the investigations. *See Wojtczak v. Department of Justice, supra,* 548 F.Supp. at 148. Indeed, refusing to apply Exemption 7 to foreign law enforcement might have the practical effect of interfering with cooperation and information sharing between the United States and foreign law enforcement agencies. *See Founding Church of Scientology of Washington, D.C. v. Levi,* 579 F.Supp. 1060, 1063, 1064 (D.D.C.1982) (approving FBI's use of Exemption 7(D) to protect the identity of foreign, state and local law enforcement agencies and noting that release of confidential information could result in "reconsideration" of these agencies' willingness to exchange essential information).[4] Surely, "legitimate government and private interests could be harmed

---

4. Indeed, courts have held that Congress did not intend to distinguish among the types of sources afforded protection under 7(D) which provides:
 This section does not apply to matters that are—
 (7) investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would ... (D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source ...

*See, e.g., Church of Scientology v. Department of Justice, supra,* 612 F.2d at 427 (Exemption 7(D) "would clearly include foreign, state and local law enforcement agencies within its scope"); *accord, Baez v. Department of Justice,* 647 F.2d 1328, 1340 (D.C.Cir.1980); *Lesar v. Department of Justice,* 636 F.2d 472, 489–91 (D.C.Cir.1980). Plaintiffs correctly point out that in these cases, the court held that Exemption 7(D) permitted the withholding of investigatory records compiled for federal law enforcement purposes if documents revealed the identity of "confidential sources" regardless of whether the sources were domestic or foreign. However, these decisions are relevant here to the extent that they are FOIA cases in which courts have specifically recognized the importance of cooperation be-

by release of certain types of information" held by the FBI concerning El Salvadoran law enforcement. *See FBI v. Abramson, supra,* 456 U.S. at 621, 102 S.Ct. at 2059.

■ In sum, Congress made Exemption 7 applicable to all "records compiled for law enforcement purposes." There appears to be no instance in which the federal judiciary, legislature or executive has reflected upon Exemption 7's applicability to records involving FBI aid in foreign law enforcement and concluded that the exemption does not apply. Further, the plain language of the exemption compels the result reached here. And finally, strong policy considerations support this interpretation. Given the congressional concerns underlying Exemption 7, I decline to construe the scope of Exemption 7 as limited to federal law enforcement, a construction which in my view is unreasonable and without support.

■ This result is not inconsistent with "the oft-repeated caveat that the FOIA exemptions are to be narrowly construed." *FBI v. Abramson, supra,* 456 U.S. at 630; 102 S.Ct. at 2064 (citing *Department of Air Force v. Rose,* 425 U.S. 352, 361, 96 S.Ct. 1592, 1599, 48 L.Ed.2d 11 (1976)). Like the Supreme Court in *Abramson,* I am "not asked in this case to expand Exemption 7 to agencies or material not envisioned by Congress." *Id.* The purpose of the FOIA is to serve disclosure of federal agency activity, not as a means for private parties to find out what facts or opinions foreign, state or local law enforcement agencies have collected or made on them or others. *Church of Scientology v. Department of Justice, supra,* 612 F.2d at 427 (citations omitted). Although the scope of Exemption 7(D) concerning the disclosure of confidential sources was at issue in *Church of Scientology,* the Ninth Circuit's discussion of statutory construction is helpful here:

> While one may employ the general purpose of the act as justification to narrow-

ly construe the exemptions where there is an absence of congressional intent on a particular area covered by one of the exemptions, one must remember that the congressional intent in enacting the exemption was to preserve, not destroy, confidentiality in certain necessary situations. Consequently to say, as appellant does here, that one's interpretation of the exemption is consistent with the general purpose of the FOIA is to ignore the congressional intent which caused and required the enactment of the exemptions in the first place.

*Id.* at 426. Similarly, to say here that plaintiffs' interpretation of the exemption is consistent with the general purpose of the FOIA is to ignore Congress' recognition of the necessity for exempting from disclosure the type of information created by the FBI in this case.

■ Having concluded that the first prong of Exemption 7(A) has been met, I turn to the second, whether the release of the requested documents will interfere with the El Salvadoran trial of those accused of the murder of the four American churchwomen. It is important to keep in mind that the amendment of Exemption 7 in 1974, enumerating six particular objectives of the exemption, *see FBI v. Abramson, supra,* 456 U.S. at 626; 102 S.Ct. at 2062, was designed to eliminate "blanket exemptions" for Government records simply because they were found in investigatory files compiled for law enforcement purposes. *See id.; NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 236, 98 S.Ct. 2311, 2323, 57 L.Ed.2d 159 (1978).

■ Although courts have held that the Government may carry its burden of proof under Exemption 7(A) with general rather than document-by-document responses to the request, *see Campbell v. Department of Health and Human Services,* 682 F.2d 256, 265 (D.C.Cir.1982); *Moorefield v. United States Secret Service,* 611 F.2d 1021, 1023–24 (5th Cir.1980), the Government's submissions "must demonstrate specifically how each document or category

tween the United States and foreign concerns

for law enforcement purposes.

of documents, if disclosed, would interfere with the investigation." *Campbell, supra,* 682 F.2d at 265. In other words, to prevail, the Government "must show, by more than conclusory statement, how the particular kinds of investigatory records requested would interfere with a pending enforcement proceeding." *Id.* at 259.

There is an extra dimension to an analysis of whether the Government has met the second prong of exemption 7(A) in a case involving a foreign enforcement proceeding, a dimension nonexistent in a case involving a domestic enforcement proceeding. In the former case, since there is no federal enforcement proceeding over which the United States has control, the FBI is not automatically presumed to know how the proceeding will unravel—who will be named as witnesses, what evidence will be introduced at trial, what strategy will be used, etc. The court may not so easily "determine the likely effect of disclosure in a common sense, generic manner," *Peltier v. Department of Justice,* No. 79–2722 slip op. at 18 (D.D.C.1983) (quoting *Copus v. Rougeau,* 504 F.Supp. 534, 538–39 (D.D.C. 1980)), since the nature and scope of foreign enforcement proceedings are not as readily apparent or ascertainable as are those of domestic enforcement proceedings, for instance, of a hearing and investigation conducted by the National Labor Relations Board, *see NLRB v. Robbins Tire & Rubber Co., supra.* Although affidavits on personal knowledge from foreign authorities describing such proceedings and the risks of disclosure are not necessarily required or dispositive, they would certainly aid the court in its determination of whether the second prong of Exemption 7(A) has been met.

 As indicated above, the FBI has submitted two declarations of Special Agent Ogden. The first defines the FBI's general categories of documents, *i.e.,* "letter", "polygraph report", "photograph", without indicating which documents fall into each or providing any information about the documents themselves. Ogden goes little beyond summarizing the documents as representing "the entire gamut of cooperation between the FBI and the authorities investigating the murders of the four churchwomen in El Salvador, including the assistance provided and advice rendered by the FBI," and then asserting that premature release would interfere with the El Salvadoran prosecution. Under Exemption 7(A), federal courts may accept generic determinations that disclosure of particular types of records generally would interfere with the enforcement proceedings. *Freedberg v. Department of the Navy,* 581 F.Supp. 3, 4 (D.D.C.1982) (citing *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 234–35, 98 S.Ct. 2311, 2323, 57 L.Ed.2d 159 (1978)). The FBI's categorization in Ogden's first declaration, however, is of little value since no effort is made to show just how, for instance, disclosure of "airtels" or "teletypes" would interfere with the proceedings. Thus, the FBI's generic categorization in and of itself fails to demonstrate how release of documents would interfere with the trial.

In response to the question raised at oral argument as to whether the FBI had met its burden of proof under Exemption 7(A) in setting forth in sufficient detail the requisite harm that would flow from the release of the requested documents, the Government submitted Ogden's second declaration. Ogden adds nothing factually to his first declaration but sets forth the following potential harms which may result from the premature release of the requested documents:

(A) the destruction or alteration of evidence;

(B) the identification of witnesses who possess information relative to the investigation and the possible harm to, or intimidation of those witnesses;

(C) the use of information released to establish fraudulent alibis to counteract evidence developed by investigators;

(D) the reluctance of sources of information released to continue providing accurate information without fear of discovery and/or reprisal; and

(E) the premature and untimely release of suspects, and dismissal of the case, due to massive pretrial publicity which would make a fair and impartial trial impossible.

Focusing on the potential harms from disclosure of only the documents relating to the laboratory reports, Ogden explains:

Among the material withheld are laboratory reports which include, *inter alia,* the results of ballistics tests, hair and fiber examinations, and fingerprint examinations. Clearly, an individual in possession of this information could use it to destroy or alter evidence, establish fraudulent alibis or counteract evidence developed by investigators. This is especially true of individuals who were heretofore not privy to the actual results of these investigations and who would attempt to thwart the investigation for sundry reasons. Assume, for example, a suspect was not aware that hair or fiber samples were located at the crime scene. Such results could be nullified by destruction of the material from which the fiber came, or fabrication of alibis to explain the presence of the hair or the fibers. The alibis could conceivably include explanations of prior meetings with the victims where the exchange of hair or fibers could have taken place, or other plausible explanations thereby attenuating the evidentiary value of the examinations. This reasoning is equally applicable to the results of the fingerprint examinations. An individual who was aware that his fingerprints were located at the crime scene could also develop alibis explaining away the presence of his fingerprints. The disclosure of the ballistics tests could also lead to destruction or alteration of evidence or the development of alibis regarding the location of the murder weapons on the day in question. These are all potential harms, but they are nonetheless real possibilities.

Also included among the material are polygraph reports. Polygraph examinations are used as investigative aids and are administered to both witnesses and subjects of an investigation. In the instant case, regardless of who was polygraphed, the disclosure of the results of a polygraph examination would clearly have a deleterious affect on prospective enforcement proceedings. Were the results known, it could lead to intimidation of witnesses and possible suspects in the investigation.

As indicated above, the FBI addressed primarily the potential effects of the premature release of the lab reports which include, *inter alia,* the results of ballistics tests, hair, fiber, and fingerprint examinations and polygraph reports, and photographs of evidentiary items used as aids in conducting the lab exams. There has been no offer by the Government to submit documents to the court for *in camera* inspection.

■ It is difficult on this record to reconcile the FBI's claim of interference with the position apparently taken by the El Salvadoran government that it has no objection to the release of laboratory examinations and polygraph tests conducted by the FBI. One must presume that the El Salvadoran government is best able to evaluate the potential harms that would flow from the release of these documents, and it is difficult to assess the role of plaintiffs' *accusador particular* with respect to his use of the requested information.

The applicability of Exemption 7(A) is not, of course, governed by what a foreign sovereign says or does, but rather by a demonstration that release of the requested document would interfere with a law enforcement proceeding, in this instance, in El Salvador. However, the Government has not come forth with any evidence to rebut plaintiffs' assertion that the El Salvadoran government has "absolutely no objection to the release of the documents under any circumstances." Granted, this particular assertion is hearsay, but given the prior communications from the government and its officials on this subject, in the absence of any response from the Government, it is the only direct evidence on the

subject. Although Ogden's second declaration better identifies the harms that would flow from disclosure of the documents pertaining to the lab reports and polygraph tests, the Government's silence or inaction with respect to the El Salvadoran government's view on this subject diminishes the strength of the declaration considerably. In sum, on this record the Government's conclusory assertion that "the very nature of the records at issue in this case makes clear that their release ... would of necessity 'interfere with enforcement proceedings'," is outweighed by the El Salvadoran government's nonobjection to disclosure.

▉ Similarly, with respect to plaintiffs' claim that certain items will be inadmissible at trial, while nothing in Exemption 7(A) suggests that the FBI must demonstrate that withheld test and lab results are admissible in the El Salvadoran proceeding, the Government is not relieved of its burden of showing how their disclosure would interfere with the El Salvadoran proceeding by a blanket assertion without specification or an explanation of the significance of such information to the prosecution.

For these reasons, I conclude that the Government has failed to meet its burden of proof on the second prong of Exemption 7(A) with respect to the release of the lab exams and polygraph tests. Although the FBI may ultimately be successful in claiming some other exemption, this particular exemption is inapplicable to these particular documents.

▉ Parenthetically, on the subject of delay, although the eventual trial of those accused of the murder of the four churchwomen appears to be contemplated at this time, it is worth noting that Exemption 7(A) cannot justify withholding unless the material withheld relates to a " 'concrete prospective law enforcement proceeding.' " *Carson v. Department of Justice,* 631 F.2d 1008, 1018 (D.C.Cir.1980) (citing remarks of Sen. Hart, quoted in *NLRB v. Robbins Tire & Rubber Co., supra,* 437 U.S. at 232, 98 S.Ct. at 2322). Given the continuous delays in the trial of murders which took place over two and a half years ago, and given the ongoing violence and political turbulence in El Salvador, there is certainly some question as to when, if ever, the trial will take place.[5]

Turning to the other documents, I decline to determine the applicability of Exemption 7(A) at this time. Except for the lab reports and polygraph tests discussed above, it is simply unclear what substantive categories of information the FBI is claiming as exempt. There are scattered references in the Government's papers to documents alleged to concern contacts by FBI representatives in El Salvador with El Salvadoran authorities regarding the direction of the investigation and advice on how to proceed, to consideration of particular cooperating witnesses of investigative interest to El Salvadoran authorities, and to confidential interviews conducted in El Salvador and in the United States. The Government has not clarified whether these substantive areas encompass all of the remaining documents after separating out those pertaining to the lab reports and polygraph tests. The Government has taken the position that "there is no reasonably segregable portion of any of the withheld material which can be released." In taking this position, the Government has made it difficult for the court to consider the documents which are separate and distinct from those pertaining to the lab reports and polygraph tests. As indicated above, the difficulty is compounded by the fact that the proceeding is a foreign one and the

---

5. The Lawyers' Committee for International Human Rights has reported, based on a visit to El Salvador in January, 1983, that:

[F]or all the attention that has been paid to this case, the government of El Salvador remains unwilling or unable to translate its promises into the trial and conviction of the guilty parties. Judged by any reasonable standard, the record of this case reveals a shocking pattern of official indifference, incompetence and ill-will-attitudes which still prevail. The case stands, more than anything, as testimony of the complete breakdown of the rule of law in El Salvador.

Printed in 38 *Record* 112, 129–30.

court cannot simply take judicial notice of how various documents might be used in or interfere with the prosecution. The best course to follow with respect to these remaining documents is to consider all of the claimed exemptions at one time.

For the reasons stated, plaintiffs' motion for partial summary judgment is granted to the extent indicated herein, and defendant's motion is denied. A conference will be held in September to schedule further proceedings in this and related actions, *see* note 1, *supra*, particularly in light of the *Vaughn* index recently submitted by the State Department in connection with *Donovan v. Department of State*, 82 Civ. 4287 (S.D.N.Y.1982).

IT IS SO ORDERED.

## ON MOTION FOR RECONSIDERATION

■■■ Presently under consideration is the timely motion of defendant Federal Bureau of Investigation. ("FBI") for reconsideration of the court's order of August 12, 1983 denying the FBI's motion and granting the motion of plaintiffs Michael Donovan, William Ford, James Kazel and Judy Keogh for partial summary judgment with respect to certain documents covered by their Freedom of Information Act ("FOIA") request for the FBI's file relating to the death of their relatives in El Salvador in 1980. At issue is the applicability of Exemption 7(A) of FOIA, 5 U.S.C. § 552(b)(7)(A),[1] to certain reports, polygraph and laboratory analyses, witness statements and forensic test results that had been previously represented to the court to be inadmissible in the courts of El Salvador and as to which no objection to release had been lodged by the Salvadoran authorities. The motion for reconsideration is based upon indications that some of the test results have been reproduced in El Salvador and would thus be admissible in courts there and that a material witness had been located, had confessed and had

been returned to El Salvador and upon the following communication in letter form from Dr. Rivera, the *Fiscal General*, or Chief Prosecutor, of El Salvador ("Dr. Rivera"), which was received subsequent to the court's order and which bears upon the prior representations.

[Seal of the Republic of El Salvador] Office of the Attorney General of the Republic
El Salvador, C.A.
San Salvador, September 23, 9183 [sic] No. 9445 (Please cite in all correspondence.)
Ref.: Dr. M.A.R.
Subject: Withdrawal and revocation of authorization contained in note date April 9, 9183 [sic].
Mr. Thomas R. Pickering
Ambassador of the United States of America
San Salvador
Mr. Ambassador:

On March 22, 1983, I received a note signed by Mr. Deane R. Hinton, then Ambassador of the United States of America to El Salvador, in which he stated that, as I was already aware, during the investigation into the murders of the four American churchwomen the FBI conducted a number of laboratory and polygraph tests at the request of the Salvadoran Government. He also informed me that Mr. William Ford wished to have copies of the reports and that the FBI was prepared to release them to him provided that written permission was obtained from whoever had ordered the tests originally, which in this case was my office.

On April 9, 1983, I replied to Ambassador Hinton that my office had no reason to oppose Mr. Ford's request and consented fully to his receiving the aforementioned copies.

I subsequently learned that under the Freedom of Information Act, if these copies were released to Mr. Ford the

---

**1.** 5 U.S.C. § 552(b) states:

This section does not apply to matters that are—

(7) investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings . . . .

general public would also have the right to receive them, and not Mr. Ford exclusively as Ambassador Hinton told me in the above-mentioned note. I granted the request out of special consideration and esteem for the father of one of the murdered churchwomen.

In view of the above, and of the fact that there has been no final judgment in the trial, I feel that releasing these tests to the public would adversely affect the normal and legal course of the proceeding as established under our laws and, given the special circumstances, I wish to inform you that I do not want these tests to be disclosed to the public. Therefore, for the reasons set forth above, I withdraw and revoke the authorization contained in the note of April 9, 1983.

I avail myself of this opportunity to renew to you the assurances of my consideration and esteem.

[Signature]
Dr. Mario Adalberto Rivera
Attorney General of the Republic
[Stamp of the Office of the Attorney General of the Republic appears on each page]
CERTIFICATION OF TRANSLA-TION
I hereby certify that the above translation hearing LS No. 116871 was prepared by the Division of Language Ser-

vices of the Department of State and that it is a correct translation to the best of my knowledge and belief.
Dated: October 4, 1983
Jorge R. Perez
Assistant Chief Translating Branch

Following the FBI's motion, the court requested the materials to be submitted for an *in camera* review, a submission which was completed on January 12, 1984. The entire file was reviewed in order to determine the character of each document in light of the FBI's blanket assertion of exemption and its claim that no reasonably segregable portion of the materials can be released.

After examination of the *in camera* submission and upon the representation quoted above and the following considerations, the motion to reconsider will be granted, the judgment will be vacated, and summary judgment will be granted for the government dismissing the complaint of the plaintiffs as to the documents which upon examination have been found to contain information, the release of which would interfere with law enforcement proceedings and as to which Exemption 7(A) therefore applies. There are other documents identified by number which do not meet the requirements of the law enforcement exemption, some, but not all, of which may be subject to another exemption.[2] I therefore con-

2. The following documents are not covered by Exemption 7(A):

| | | | |
|---|---|---|---|
| 4 | 119 | 139–A | 271 |
| 8 | 120–A | 146 | 275 |
| 14 | 120–D | 152–B | 281 |
| 16 | 120–E | 164 | 282 |
| 18 | 120–F | 166 | 283 |
| 19 | 120–G | 166–A | 285 |
| 23 | 120–H | 179 | 297 |
| 29 | 120–J | 180 | 297–A |
| 33 | 120–K | 186 | 297–B |
| 40 | 121 | 187–B | 297–C |
| 51 | 122–A | 187–C | 297–D |
| 52–A | 126 | 189–A | 299 |
| 56 | 126–A | 189–B | 305 |
| 59 | 126–B | 194 | 306 |
| 61 | 128 | 194–A | 307 |
| 73–A | 128–A | 202 | 310 |
| 82 | 129 | 241 | 325 |
| 94 | 130 | 248 | 330 |
| 103 | 131 | 254 | 331 |
| 116 | 133 | 255 | 332 |
| 118 | 133–A | 259 | 333 |

clude that the assertion of a blanket exemption was inappropriate and that a *Vaughn* index should have been prepared.[3] The documents to which the law enforcement exemption does not apply will be turned over if no further claim of an exemption is made within twenty (20) days. The entire file is returned herewith to the FBI.

The difficulty and sensitivity of the issues presented cannot be overstated and are reflected in the daily headlines. This clash between freedom of information and law enforcement results from the government's invocation of Exemption 7(A) to keep from plaintiffs, who are relatives of the four churchwomen murdered in El Salvador on December 2, 1980, the results of the FBI investigation undertaken inside and outside El Salvador in an effort to assist the government of El Salvador in identifying and trying the murderers.

This file, FBI file 163–49105, contains ten volumes, is more than a foot thick and is said to consist of 2,912 pages. It is a characteristic file created by the FBI in the course of a criminal investigation, complicated by the difficulties resulting from the foreign jurisdiction involved. Among the

materials in the file are the anticipated authorizations, reports, witness statements and laboratory analyses. In addition, there are communications from the Departments of State and Justice, the Central Intelligence Agency and others in the executive branch and from various agencies of El Salvador, describing among other things the course of the investigation and its relationship to the enforcement proceedings, as well as reports of communications between members of these agencies. Some, but not all, of these communications appear on their face likely to be subject to the national security exemption, 5 U.S.C. § 552(b)(1), or other FOIA exemptions, an issue premature to the present consideration. The file reveals a significant, impressive and effective investigation.

The file itself is, of course, an investigative document, but the parties appear to be in agreement that each document within the file should be separately examined, which was done. Many of the documents in the file contain both exempt and nonexempt material. I have concluded the nonexempt factual material is so interspersed with exempt material that the nonexempt material is not "reasonably segreg-

| | | | |
|---|---|---|---|
| 334 | 375 | 448–A | 490–RR |
| 339 | 376 | 450 | 531 |
| 340 | 377 | 450–A | 534 |
| 340–A | 377–A | 450–C | 539 |
| 341 | 378 | 451 | 548–B |
| 342 | 379 | 452 | 552 |
| 353 | 379–A | 463 | 554 |
| 353–A | 380 | 464 | 555 |
| 355 | 391–A | 474 | 558 |
| 358–A | 394 | 476 | 559 |
| 359 | 398 | 480 | 569 |
| 359–A | 401 | 481–E | 570 |
| 361 | 402 | 485 | 575 |
| 361–A | 403 | 487 | 580 |
| 362 | 407 | 490–S | 581 |
| 363 | 410 | | |
| 364 | 410–A | | |
| 365 | 411 | | |
| 366 | 412 | | |
| 370 | 413 | | |
| 370–A | 421 | | |
| 373 | 422 | | |
| 373–A | 424 | | |
| 374 | 448 | | |

**3.** *See Vaughn v. Rosen,* 484 F.2d 820 (D.C.Cir. 1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). In correspondence accompanying the submission of the file, counsel for the FBI have indicated their awareness that certain of the documents may not be exempt and that a specification of such documents might be forthcoming. Such specification has not been received to date.

able" under the final clause of § 552(b). *See Lead Industries Association, Inc. v. OSHA*, 610 F.2d 70, 86–88 (2d Cir.1979), Because of this, such documents have been classified as exempt and no attempt at redaction has been undertaken.

My review of the documents submitted *in camera* leaves no doubt that if the laws to be enforced were those of the United States and if the effort were subject to our jurisdiction and procedure, the release of the documents subject to the exemption would "interfere with enforcement proceedings" within the meaning of 5 U.S.C. § 552(b)(7)(A). However, the question thus posed by the exemption begs the underlying and highly charged issue—is there law enforcement in El Salvador as Congress understood the term.

Since the application of Exemption 7(A) to a foreign enforcement proceeding has not previously reached the courts, it is appropriate to consider the legislative history and those decisions which have considered in a domestic context whether an enforcement proceeding existed or was likely to occur. The floor debate indicates that Congress intended this exemption, added as an amendment to FOIA in 1974, to overrule previous judicial interpretations of FOIA under which all investigative material compiled for law enforcement purposes was exempt—even if the enforcement proceeding was no longer likely to occur. *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 227–232, 98 S.Ct. 2311, 2319–2322, 57 L.Ed.2d 159 (1978). Senator Hart, who introduced Exemption 7(A), stated that it would apply "whenever the Government's case in court—*a concrete prospective law enforcement proceeding* —would be harmed by the premature release of evidence or information ...." [emphasis added] *Id.* (quoting 1975 *Source Book* 333). The exemption was passed "to indicate that 'with passage of time, ... when the investigation is all over and the purpose and point of it has expired, it would no longer be an interference with enforcement proceedings and there ought to be disclosure.' " *NLRB, supra*, 437 U.S. at 232, 98 S.Ct. at 2322 (quoting 2 *Hearings on S. 1142 et al before the Subcomms. on Administrative*

*Practice and Procedure and Separation of Powers of the Senate Judiciary Comm. and the Subcomm. on Intergovernmental Relations*, 93d Cong., 1st Sess. 158 (1973)). "Courts have held that 7(A) applies when a law enforcement proceeding is 'pending or contemplated,' *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 870 (D.C.Cir.1980); or 'in prospect,' *New England Medical Center Hospital v. NLRB*, 548 F.2d 377, 383 (1st Cir.1976); or where the investigation will 'hopefully lead to a prospective law enforcement proceeding,' *National Public Radio v. Bell*, 431 F.Supp. 509, 514 (D.D.C.1977)." *Ehringhaus v. FTC*, 525 F.Supp. 21, 23 (D.D.C.1980). *See also Title Guarantee Co. v. NLRB*, 534 F.2d 484, 490–91 (2d Cir.) (exemption applies to "pending" enforcement proceedings), *cert. denied*, 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976).

*National Public Radio*, supra, provides a helpful factual setting and discussion. Journalists had sued under FOIA to obtain, among other things, documents related to Justice Department and FBI investigations of the contamination of Karen Silkwood with plutonium. The investigation, concerning a violation of a federal statute prohibiting unauthorized handling of nuclear materials, involved the interviewing of numerous prospective witnesses and resulted in the Justice Department Criminal Division's conclusion that federal law probably had been violated. The government claimed that Exemption 7(A) exempted the documents from disclosure. In holding the material exempt, the court stated:

In the instant case, the Department of Justice has conducted an extensive investigation into the suspected commission of a federal crime. The usual, expected outcome of such an investigation would be the apprehension and conviction of a perpetrator or perpetrators presently unknown. Although the defendant freely admits that the investigation is presently in a "dormant" stage in that all available investigative leads have been pursued and that the Department's limited financial resources preclude the current assignment of an investigative agent, the

current investigation is nonetheless an "active" one which will hopefully lead to a "prospective law enforcement proceeding." In this way, it differs markedly from the cases which the 1974 Amendment was intended to overrule, and presents the very real possibility of a criminal learning in alarming detail of the government's investigation of his crime before the government has had the opportunity to bring him to justice.

The Court does not believe that such a prospect was intended by Congress when it enacted the 1974 Amendment, nor would it comport with the broad latitude of prosecutorial discretion traditionally accorded in similar cases.

*Id.* at 514–15.

The standard used to apply Exemption 7(A) must be viewed in the context of "the oft-repeated caveat that FOIA exemptions are to be narrowly construed," *FBI v. Abramson*, 456 U.S. 615, 102 S.Ct. 2054, 2064, 72 L.Ed.2d 376 (1982), and the fact that the burden of proof in FOIA cases is on the government. 5 U.S.C. § 552(a)(4)(B); *Church of Scientology of California v. U.S. Department of the Army*, 611 F.2d 738, 742 (9th Cir.1980).

Part of the difficulty in determining the existence of law enforcement in El Salvador stems from the problems of understanding and obtaining information about law enforcement in a foreign country, problems that are even greater when the country is war-torn El Salvador. The prosecution for crime in a civil law jurisdiction such as El Salvador has been described as follows:

The typical criminal proceeding in the civil law world can be thought of as divided into three basic parts: the investigative phase, the examining phase, and the trial. The investigative phase comes under the direction of the public prosecutor, who also participates actively in the examining phase, which is supervised by the examining judge. The examining phase is primarily written and is not public. The examining judge controls the nature and scope of this phase of the proceeding. He is expected to investigate the matter thoroughly and to prepare a complete written record, so that by the time the examining phase is complete, all the relevant evidence is in the record. If the examining judge concludes that a crime was committed and the accused is the perpetrator, the case then goes to trial. If he decides that no crime was committed or that the crime was not committed by the accused, the matter does not go to trial.

\* \* \* \* \* \*

As a consequence of the nature of the examining phase of the criminal proceeding, the trial itself is different in character from the common law trial. The evidence has already been taken and the record made, and this record is available to the accused and his counsel, as well as to the prosecution. The function of the trial is to present the case to the trial judge and jury, and to allow the prosecutor and the defendant's counsel to argue their cases.

J. Merryman, *The Civil Law Tradition: An Introduction to the Legal Systems of Western Europe and Latin America* 37–38 (1969).

In addition, those injured by the alleged crime have the right to be represented by a private prosecutor, the *accusador particular*. However, the *accusador particular* cannot present evidence, and the plaintiffs here apparently have not yet hired an *acusador particular*, perhaps because of the risks thought to be involved. *See* Posner & Greathead, *Justice In El Salvador: A Report by the Lawyers Committee for International Human Rights on the Investigation into the Killing of Four U.S. Churchwomen*, 14 Colum.Hum.Rts. L.Rev. 191, 203 (1982–83).

The status of the investigation and enforcement proceedings against the murderers of the churchwomen is not easy to determine, particularly on the record as it appears from the filed material. Plaintiffs have submitted a translation of a letter dated September 6, 1983 from Dr. Rivera to the Honorable Silvio O. Conte, Member of Congress, describing steps that had taken place and were planned in the Salvado-

ran government's investigation of the crime. The letter also states that "With respect to some evidence found by the FBI, we are considering using it, if necessary, at the time the case is presented before the jury." In addition, Dr. Rivera's letter to the U.S. Ambassador set out above states that "In view of ... the fact that there has been no final judgment in the trial, I feel that releasing these tests to the public would adversely affect the normal and legal course of the proceedings as established under our laws." Finally, an FBI agent with FOIA responsibilities has stated in an affidavit submitted by the FBI that, in June 1983, the Salvadoran National Police were conducting ballistics tests and preparing enlarged photomicrographs relating to the murders, and that on July 30, 1983 a material witness located by the FBI in Los Angeles was returned to El Salvador and gave a twelve-page statement detailing an alleged confession in the murder.

On the other hand, it is obvious that the trial of those presently charged with the murders, which took place more than three years ago, has not taken place and has become in itself a political issue, in both El Salvador and the United States. A distinguished lawyer and public servant, a respected former judge of this court, the Honorable Harold R. Tyler, Jr., was commissioned to review the situation in El Salvador including the circumstances surrounding the law enforcement proceedings related to the murders. His report to the State Department, like this file, has been given confidential treatment. *See* N.Y. Times, Dec. 14, 1983, at A1, col. 4. However, Judge Tyler was reported to have expressed concern that political pressures in El Salvador could undermine the government's ability to bring the murderers to justice. *Id.* at A20, col. 3.

In addition, despite the narrowness of the issue presented, that is, the pendency of a law enforcement proceeding, I cannot blithely apply customary concepts of our law and its enforcement when it is widely reported that death squads roam unimpeded and unimpeached in El Salvador and hundreds, if not thousands, have been murdered in that country in recent years, without effective investigation or prosecution. *See* DeWind & Kass, *Justice in El Salvador: A Report of a Mission of Inquiry,* 38 Rec.A.B. City N.Y. 112, 119–32 (1983); N.Y. Times, Dec. 3, 1983, at A6, cols. 2,5; N.Y. Times, Jan. 17, 1984, at A6. Indeed, the United States States Department reported recently that El Salvador's judicial system was "in a state of virtual collapse." The report stated that "Convictions in serious criminal cases, in particular those with political overtones of any kind, are virtually unobtainable because of intimidation (usually only implicit) and corruption of judges, lawyers, witnesses and jurors." *See* N.Y. Times, Dec. 14, 1983 at A20, col. 5. The President's certification for foreign aid purposes states simply that the Salvadoran government is making slow progress on human rights. *See id.* at A20, col. 4. In the relative quiet and order of the courthouse in Foley Square it is impossible to determine the cause of the delay in prosecuting the murderers of the four churchwomen, although the *in camera* materials contain considerable information on the subject. Clearly, even at best, law enforcement in El Salvador is of a different character and presented in a different fashion than that customarily encountered in this court.

■ The record before me establishes by a rather narrow preponderance that an enforcement proceeding regarding the murders is pending and that to reveal the FBI documents would interfere with that proceeding. The trial delay to date does not in and of itself establish a failure of law enforcement. To resolve the issue by the use of the documents reviewed *in camera* would be inappropriate and well beyond the purpose for which the *in camera* submission was made. Dr. Rivera's statements quoted above indicate that an enforcement proceeding is still pending. The newspaper accounts of the collapse of El Salvador's judicial system—which may or may not be admissible under Fed.R.Evid.P. 201—do not outweigh the facts in the record before me. In short, although the indications that this proceeding may never take place are deeply troubling, there is insufficient evi-

dence before me, and indeed perhaps extant, upon which I could conclude that Dr. Rivera's representation is not facially accurate.

I conclude that the government has established its law enforcement exemption by a preponderance of the evidence submitted. Accordingly, this court's opinion of August 12, 1983 is vacated. Plaintiffs' summary judgment motion is denied. Defendant's motion for partial summary judgment on the applicability of Exemption 7(A) to the documents other than those listed in footnote 2 is granted. All other documents will be turned over if no further claim of exemption is made as to them within twenty (20) days. A conference will be held within ten (10) days of that date to schedule further proceedings in this and the related actions.

IT IS SO ORDERED.