772 F.2d 966
 249 U.S.App.D.C. 48
 DIRECT MARKETING ASSOCIATION, INC. and Interstate Directory
Assistance Users, Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
MCI Telecommunications Corporation, Ad Hoc
Telecommunications Users Committee, GTE
Corporation, American Telephone and
Telegraph Company, Intervenors.
 No. 84-1249.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 20, 1985.
Decided Sept. 6, 1985.
 
 N. Frank Wiggins, Washington, D.C., with whom Ian D. Volner, Washington, D.C., was on brief, for petitioners.
 John E. Ingle, Counsel, F.C.C., Washington, D.C., with whom Bruce E. Fein, Gen. Counsel, F.C.C., J. Paul McGrath, Asst. Atty. Gen., Dept. of Justice, Daniel M. Armstrong, Associate Gen. Counsel, Carl D. Lawson, Counsel, F.C.C., Andrea Limmer and John J. Powers, III, Attys., Dept. of Justice, Washington, D.C., were on brief, for respondents.
 
 
 1
 Theodore D. Kramer, Washington, D.C., with whom Michael H. Bader, Kenneth A. Cox, William J. Byrnes and Thomas R. Gibbon, Washington, D.C., were on brief, for intervenor MCI Telecommunications Corp. Robert Michelson, New York City, entered an appearance for MCI.
 
 
 2
 Jules M. Perlberg, Chicago, Ill., with whom Sanford Tannenbaum, Marc N. Epstein and Michael Berg, Detroit, Mich., were on brief, for intervenor AT & T.
 
 
 3
 Joseph M. Kittner and James S. Blaszak, Washington, D.C., entered appearances for intervenor Ad Hoc Telecommunications Users Committee.
 
 
 4
 James R. Hobson and Mitchell F. Brecher, Washington, D.C., entered appearances for intervenor GTE Corp.
 
 
 5
 Samuel A. Simon, Washington, D.C., entered an appearance for intervenor Telecommunications Research and Action Center.
 
 
 6
 Before MIKVA, EDWARDS and GINSBURG, Circuit Judges.
 
 
 7
 Opinion for the Court filed by Circuit Judge MIKVA.
 
 MIKVA, Circuit Judge:
 I. BACKGROUND
 
 8
 In 1983, the Federal Communications Commission (FCC or the Commission) ordered telephone companies to file tariffs implementing equal access. Tariffs were to be filed yearly, on 90 days' notice. The first tariffs were due to be filed on October 3, 1983, to become effective January 1, 1984. American Telephone & Telegraph Company (AT & T) filed eight tariffs implementing the FCC's equal access doctrine for a broad range of services.
 
 
 9
 In response to numerous requests, the FCC suspended the effective dates of all the tariffs filed to April 3, 1984. As the FCC noted: "The more than 1500 local exchange companies have filed 76 separate access tariffs plus over 100 associated tariffs. ... Altogether, we have received about 43,000 pages of new access and divestiture-related tariffs and over 160,000 pages of support information." Memorandum Opinion and Order, p 5, FCC 83-470, released October 19, 1983, Joint Appendix (J.A.) at 255, 257. The FCC began an investigation into the issues raised by the tariffs.
 
 
 10
 One of the services covered by AT & T's tariffs was Interstate Directory Assistance (IDA). Under the predivestiture regime, there had been no charge for IDA; AT & T had recovered the cost of providing IDA service from the revenues from long distance calls placed through AT & T. As a result, customers of the non-AT & T long distance services were receiving free IDA service also. In the tariff, AT & T proposed to "unbundle" the IDA services from other services and charge 75 cents per call for IDA, while allowing up to one free IDA call per month if the IDA user placed at least one long distance call via AT & T during that month. AT & T had requested a 75 cent charge on the basis of several cost components of the service, including the cost of receiving the actual information from local exchange carriers, billing costs, and transportation costs. AT & T's original figures showed costs of slightly over 75 cents per call, including 64 cents for local exchange carrier costs, of which 59 cents represented the directory assistance charge.
 
 
 11
 The local exchange carriers' tariffs covered their portion of the charges for IDA. The FCC noted that the charges varied widely, without apparent explanation, and suspended the tariff. The FCC investigated this issue and issued an order on February 17, 1984:
 
 
 12
 One of our basic policy goals is to move toward rates which recover the costs of service from the cost-causer, where feasible. ...
 
 
 13
 In the present case, however, the cost basis for the directory assistance rates is very doubtful. The rates vary widely for no discernable [sic] reason. For example, the rate in the District of Columbia is $.22 and in West Virginia $.93 though both are C & P Telephone companies. The support material also present [sic] substantial questions, including whether costs are fairly assigned to state and interstate use. These rates are also substantially higher than the state rates in most cases, and state rates generally permit a number of free calls. The charging of very different rates to customers for the same service is a matter of concern. For these reasons--to move toward rates fairly based on costs, and to permit consideration of the actual costs and possible issues of discrimination,--we are prescribing an interim one year charge no higher than 25 cents for the directory assistance service call element of access tariffs for carriers whose charges are on a per call basis. We are also requesting further information from the carriers in order to resolve issues relating to directory assistance and will consider these issues later in this investigation.
 
 
 14
 Memorandum Opinion and Order, p 84, FCC 84-51, released Feb. 17, 1984, J.A. at 288, 322.
 
 
 15
 The prescription of a maximum 25 cent charge obviously affected AT & T's cost figures for IDA. Although AT & T did not submit a revised tariff for this service, it indicated informally to the FCC that it would be willing to take the lower cost into account and would accept a lower IDA charge as appropriate. Using the 25 cent charge, AT & T represented its costs of providing IDA at $.494. In other comments received by the FCC, local carriers suggested that the IDA charge should be 50 cents, with one free call per month per account. The free call provision was discussed as a method of easing the transition to IDA charges for the vast majority of residential customers who use IDA infrequently. The information available to the FCC indicated that residential customers typically use IDA less than once a month. The bulk of the rest of IDA use is attributable to so-called "heavy users," commercial entities such as credit agencies.
 
 
 16
 On May 15, 1984, the FCC released a Memorandum Opinion and Order addressing various aspects of the AT & T tariffs. The FCC ordered AT & T to file overall reductions in public long distance rates of 6.1%. In the order, the FCC went on to discuss IDA charges:
 
 
 17
 We require AT & T to implement an immediate uniform, across-the-board 6.1 percent reduction in MTS and WTS rates by means of revisions to its currently-effective Tariffs FCC Nos. 263 and 259. AT & T may also file an IDA charge of no more than 50 cents per call, provided it offers at least two free IDA calls per month.
 
 
 18
 Memorandum Opinion and Order, p 119, FCC 84-201, released May 15, 1984, J.A. at 368, 423. An appendix to that order discusses IDA charges further. The Commission noted that AT & T had originally requested at 75 cent charge per call, and that the Commission's subsequent order limiting the local exchange carriers' charges to 25 cents changed the cost figures for AT & T. "Following our February order, which capped the operator assistance charge by local companies at 25 cents pending further investigation, AT & T has indicated that its costs would be about 50 cents per call." Id., Appendix C, J.A. at 428. The Commission went on to discuss its reasons for allowing two free calls per month, concluding: "[W]e believe that allowing a minimum of two free calls per month will provide the interstate long distance information needed by the great majority of local subscribers, while still encouraging efficient use of the service and recovering the costs fairly from heavy users." Id. Finally, the Commission stated: "Based on the record before us, we will permit the 50 cent charge to become effective, although we will continue to review the charges of both the local carriers' [sic] and AT & T." Id. at 429.
 
 
 19
 In a subsequent order concerning other issues raised by the AT & T tariff, the Commission referred to the May 15 order:
 
 
 20
 In the October 3 filings, ATTCOM proposed some significant modifications in rate relationships ... and a 75 cent charge for interstate directory assistance (DA) with up to one free call. Virtually all of the comments concerning these tariffs submitted in the course of this investigation addressed those aspects of the filing. All such comments have been addressed in or made moot by the Cost Order, with its prescription of an initial across-the-board rate reduction and a 50 cent DA charge with two free calls per month. Accordingly, we do not reach or consider those issues here.
 
 
 21
 Memorandum Opinion and Order, p 3 FCC 84-291, released August 3, 1984, J.A. at 430, 431.
 
 
 22
 Direct Marketing Association (DMA), a heavy user of IDA, petitioned for review of the May 15, 1984 order on the issue of IDA charges. MCI intervened in support of Direct Marketing, and AT & T intervened in support of the FCC. DMA attacks the May 15 order on the grounds that the FCC prescribed a rate unreasonably far above AT & T's costs and that the two free call provision effects unlawful rate discrimination between heavy users of IDA and light (usually residential) users. MCI challenged the aspect of the two free call provision which allows the free calls only if the user also makes long distance calls on AT & T systems. AT & T contends that MCI cannot raise this issue as an intervenor because the petitioner did not raise the issue and an intervenor cannot expand the issues to be decided by this Court. We do not reach these issues, because we find the challenged order to be nonfinal and therefore unreviewable.
 
 II. ANALYSIS
 
 23
 Direct Marketing contends that the FCC's May 15 order amounted to a prescription of rates under section 205 of the Communications Act, 47 U.S.C. Sec. 205 (1982) and therefore was a final order. If the FCC did prescribe rates under section 205, DMA contends that the rates so prescribed are not just and reasonable, in violation of section 205, and discriminatory under section 202. If the FCC did not prescribe rates, its order is not final because it only represented a tentative decision not to suspend and investigate rates under section 204. A decision not to suspend and investigate is unreviewable, in part because anyone may still complain to the Commission under section 208. See Southern Ry. v. Seaboard Allied Milling Corp., 442 U.S. 444, 455, 99 S.Ct. 2388, 2394, 60 L.Ed.2d 1017 (1979); Aeronautical Radio, Inc. v. FCC, 642 F.2d 1221, 1234 (D.C.Cir.1980), cert. denied, 451 U.S. 920, 101 S.Ct. 1998, 68 L.Ed.2d 311 (1981). The FCC argues that it did not prescribe the 50 cent/two free call rate.
 
 
 24
 Both sides argue that the case law for determining whether an agency has prescribed rates favors their side. The case law does not set out any clear test for making this determination. In Trans Alaska Pipeline Rate Cases, 436 U.S. 631, 98 S.Ct. 2053, 56 L.Ed.2d 591 (1978), the Supreme Court considered whether the ICC had prescribed rates for the transportation of the North Slope Oil via the newly-constructed pipeline. The ICC had suspended the initial tariffs filed by the pipeline's owners and calculated "new rates that approximated what full investigation would likely reveal to be lawful rates." 436 U.S. at 637, 98 S.Ct. at 2058. The ICC stated that it would not suspend interim tariffs which "specified rates no higher than those estimated." Id. The Supreme Court held that this statement did not amount to a prescription of rates. In so doing, the Supreme Court stated:
 
 
 25
 The foundation for a suspension is the Commission's conclusion that a proposed rate is probably unreasonable or unjust.... To make such a determination, the Commission is obviously required to form a tentative opinion about the location of the line between the just and the unjust, the reasonable and the unreasonable.
 
 
 26
 Id. at 653, 98 S.Ct. at 2065-66. The pipeline owners maintained, however, that the Commission could not go on to specify where the dividing line was.
 
 
 27
 No principle of law requires the Commission to engage in a pointless charade in which carriers desiring to exercise their ... rights are required to submit and resubmit tariffs until one finally goes below an undisclosed maximum point of reasonableness and is allowed to take effect. The administrative process, after all, is not modeled on "The Price is Right." What the Commission did here, therefore, far from being condemnable, is an intelligent and practical exercise of its suspension power which is thoroughly in accord with Congress' goal ... to strike a fair balance between the needs of the public and the needs of regulated carriers. Indeed, the Commission might well have been derelict in its duty had it insisted on charade once it had determined that there was a way TAPS could operate without harm to the public.
 
 
 28
 Id. at 653-54, 98 S.Ct. at 2065-66. The Supreme Court thus decided that the ICC had not prescribed rates unlawfully.
 
 
 29
 In Moss v. CAB, 430 F.2d 891 (D.C.Cir.1970), this Circuit was faced with different facts and came to a different conclusion. The Civil Aeronautics Board, which at the time was responsible for regulating the fares charged by airlines, suspended tariffs on file and ordered an investigation into fares. After numerous ex parte meetings with airline representatives, the CAB announced that it would permit tariff filings implementing a detailed formula for determining fares. The Board threatened to suspend any tariffs which were not in accord with the formula, making it clear that "only rates conforming to its detailed model would be accepted and not suspended." 430 F.2d at 897. This Circuit held that "[a]s a practical matter, the Board's order amounted to the prescription of rates because, as the Board admits, the pressures on the carriers to file rates conforming exactly with the Board's formula were great, if not actually irresistible." Id. Because the practical effect was to prescribe what rates would be filed, the court held that the CAB had prescribed rates unlawfully. The court focused on the circumstances under which the formula was determined: the public was excluded from the meetings between the carriers and the CAB.
 
 
 30
 The Second Circuit has also had occasion to consider whether the FCC prescribed rates in other circumstances. AT & T had offered a service called Telpak, wherein large customers could obtain bulk private-line long distance service at reduced rates. Under the Telpak tariff, AT & T permitted some small users to share Telpak service in order to qualify. Some users were not able to participate in the shared Telpak service, and complained to the Commission. The Commission investigated the matter and concluded that the Telpak sharing program was unlawfully discriminatory and ordered the carriers to file revised tariffs providing for unlimited sharing. The Second Circuit reversed the order because the FCC did not make the proper findings sufficient to justify a prescription of unlimited sharing. American Telegraph & Telephone Co. v. FCC, 449 F.2d 439 (2d Cir.1971). After this decision, the Commission ordered the carriers to file tariff revisions eliminating the unlawful discrimination, without specifying the method the carriers should use. The carriers responded by eliminating all Telpak sharing. A group that lost Telpak services as a result of this change challenged the FCC's order, claiming that it was "tantamount to a prescription of the elimination of all sharing." National Ass'n of Motor Bus Owners v. FCC, 460 F.2d 561, 566 (2d Cir.1972). The court decided that the FCC's action did not amount to a prescription. The court distinguished Moss v. CAB, supra, stating that in Moss,
 
 
 31
 [t]he situation was not such that the airlines in fact had an option to choose between alternatives. ... By contrast, though the Commission here knew the carriers' preference, it did not preclude them from selecting an alternative to the elimination of sharing. ... Moreover, in Moss, the CAB had said that any rates other than those derived from its formula would be considered prima facie unreasonable....
 
 
 32
 460 F.2d at 567.
 
 
 33
 Finally, in Consolidated Edison Co. v. FPC, 512 F.2d 1332 (D.C.Cir.1975), this court discussed the factors to be considered when determining if an agency has unlawfully prescribed. The test focuses on the practical impact of the agency's actions. Cf. American Telephone & Telegraph Co. v. FCC, 487 F.2d 865, 874 (2d Cir.1973) (determination whether agency prescribed depends on actual impact of agency's actions rather than the form of the action). The court looked to several indicia to determine the impact of the FPC's actions. The FPC had issued an order outlining its policy on curtailments in gas supply by pipelines resulting from the gas shortage. The FPC did not require the pipelines to conform to the order, but noted that new tariffs not in accord with the priorities stated in the order "may be found to be unjust and unreasonable." 512 F.2d at 1337. "The Commission also voiced its general intention not to suspend conforming tariff sheets." Id. at 1340. The pipelines which conformed with the agency's policy had little to lose, because they would sell their gas regardless of the curtailment plan used to allocate the gas. The court assessed the pressure on the pipelines resulting from the FPC's order, and found it insufficient to amount to a prescription. Some pipelines did not conform to the order, and the court took this for "evidence of a degree of independence and flexibility on the part of the pipelines." Id. at 1341. Next, the court analyzed the regulatory context and the potential for abuse of power by the agency. There were significant differences between the circumstances in that case and in Moss. "The CAB's rate formula was the product of behind-the-scenes bartering between the agency and the carriers, and ... none of the tariffs filed consistent with the CAB's formula were subject to investigation after they became effective." Id. The FPC expressly envisioned further proceedings examining its order. "The effect of the Commission's choice of procedure was thus to favor rapid implementation over prior hearing, not to avoid public scrutiny entirely." Id. at 1342. The court held that the FPC had not prescribed curtailment policy by issuing the order. In sum, the courts have considered the amount of pressure on the subject of the order, as measured by the options available to the subject and the amount of threat that the agency will suspend nonconforming tariffs. In practice, an agency statement has not been found to be a prescription absent explicit language that nonconforming tariffs will be rejected, combined with an agency motive to avoid public scrutiny and perhaps even judicial review.
 
 
 34
 In the case at hand, MCI argues that the practical impact of the FCC's May 15 order was to prescribe rates. MCI makes the unsupported assertion that "AT & T had no practical choice but to file an IDA charge with the free call and usage requirements that the Commission had specified." Reply Brief of Intervenor MCI at 20. It is difficult to assess the pressure on AT & T to conform to the FCC's suggestion of a 50 cent/two free call rate when AT & T was clearly amenable at least to a 50 cent/one free call rate. The language of the May 15 order certainly conveys the FCC's suggestion. It does not, however, contain the threatening language or tone present in the CAB's order in Moss. The order does not state that nonconforming tariffs will be rejected. Indeed, the language is more like the orders in the Trans Alaska Pipeline Rate Cases and in Consolidated Edison, supra, which stated that rates no higher than those suggested would not be suspended. See supra page 967. In these circumstances, AT & T's compliance with the FCC's suggestion does not demonstrate irresistible pressure by the FCC. Rather, as in Trans Alaska, it appears that the FCC came to a tentative conclusion about the line between reasonable and unreasonable IDA charges, and decided not to play "The Price is Right." We cannot condemn the FCC for so doing.
 
 
 35
 DMA suggests that the 50 cent charge "appears to have emerged from the meetings between the agency staff and representatives of the industry," Reply Brief of Petitioners at 7, raising specters of the Moss v. CAB situation. But DMA admits that the FCC established a separate comment cycle concerning the proposed rate. Unlike the CAB in Moss, the FCC in this case took steps to ensure that this issue received thorough public scrutiny. The record reveals that DMA not only submitted comments on the IDA issue, but also submitted reply comments. J.A. at 354-64. This case does not present the situation where the agency representatives and the industry regulated by the agency have excluded the public and interested parties from participation in the evaluation of IDA rates. The rate formula was not announced after ex parte meetings, but after a separate comment cycle open to the public and which DMA took advantage of. We note that the FCC, in an attempt to ensure comprehensive review of the numerous issues raised by the equal access tariffs, had not established separate comment cycles for each issue raised. The use of one here, therefore, further negates any inference that the FCC's actions bore the same motives as the CAB's in Moss.
 
 
 36
 Petitioners argue that the FCC's description, in a later order, of the May 15 order as a prescription, demonstrates that the FCC did indeed prescribe the 50 cents/two free call rate. Counsel for the FCC stated at oral argument that this description was inaccurate and that its staff sometimes makes such errors. As we have noted, it is not the FCC's description that is relevant, but the actual impact of its actions. See AT & T v. FCC, 487 F.2d 865 (2d Cir.1973). This principle does not excuse the FCC from teaching its staff to use accurate language in all its pronouncements, precisely in order to avoid the sort of confrontation presented here. Insofar as the FCC's later description may have any persuasive weight, it is counterbalanced by the implications of the language of the May 15 order. In the same paragraph, the FCC stated that it "required" AT & T to implement the long distance rate reduction and that AT & T "may file" the suggested IDA rate. There is no question that the FCC meant to prescribe the long distance rate reduction. The differences in the language used by the FCC strongly imply that the FCC did not intend to prescribe IDA charges at the time it issued the order.
 
 
 37
 We therefore find that the FCC did not prescribe rates pursuant to section 205, and therefore did not violate section 205. The May 15 order thus only represents the FCC's determination not to suspend and investigate an IDA tariff in conformity with its suggestion. As we have stated, that decision is not reviewable. See supra page 968. Moreover, the May 15 order is not a final order representing the culmination of the administrative process. Petitioners and intervenors are free to file a complaint under section 208 to challenge the IDA tariff, which will give all the concerned parties an opportunity to fully litigate the questions concerning the appropriateness of the rate and its structure.
 
 
 38
 This case is a textbook example of the reason for nonreviewability prior to the completion of all administrative proceedings. Much of the debate at oral argument and in the briefs concerned whether the FCC was relying upon evidence in the record, whether the FCC had made findings or was merely accepting estimates provided by AT & T, and whether there was sufficient evidence in the record to support the alleged rate prescription. Had the parties proceeded by complaint, as they are still free to do, these issues would have been explored and the record would have been clearer and more definite. We note that the complaint proceeding that may now take place is no different from the one which should have preceded petitioner's recourse to this court. There is no preclusive effect to anything the Commission said on the IDA rate before this court. The decks are now clear for a complete and proper resolution of the issues raised by the petitioners and intervenors.
 
 
 39
 Accordingly, Direct Marketing Association's petition for review is
 
 
 40
 Denied.